Linda LANGE, Plaintiff,

v.

**TOWN OF MONROE, Roy Montanye, Highway Superintendent, Donald Weeks, Member, Town of Monroe Town Board, Sandy Leonard, Member, Town of Monroe Town Board, Defendants.**

No. 00 CIV. 5760(WCC).

United States District Court,
S.D. New York.

Aug. 2, 2002.

Law Offices of Michael H. Sussman, Goshen, NY (Michael H. Sussman, of Counsel), for plaintiff.

Miranda & Sokoloff, LLP, Mineola, NY (Brian S. Sokoloff, Of Counsel), for Defendants Town of Monroe, Donald Weeks and Sandy Leonard.

Jackson Lewis LLP, White Plains, NY (Joseph A. Saccomano, Jr., Joseph DeGiuseppe, Jr., Of Counsel), for Defendant Roy Montanye.

## OPINION AND ORDER

WILLIAM C. CONNER, Senior District Judge.

Plaintiff Linda Lange, a female employee of the Town of Monroe (the "Town"), brings the instant action pursuant to 42 U.S.C. § 1983 and 28 U.S.C. § 1367 against the Town and Town Board Members Donald Weeks and Sandy Leonard (collectively the "Town defendants") and Highway Department Superintendent Roy Montanye,[1] alleging, *inter alia*, that defendants violated her rights guaranteed under the Equal Protection Clause of the Fourteenth Amendment and N.Y. Exec. L. § 296. Defendants[2] now move for summary judgment pursuant to Fed. R. Civ. P. 56. For the reasons that follow, defendants' motion is granted.

## BACKGROUND

The Town, a municipality organized under the laws of the State of New York, is governed by a five-member Town Board (the "Board") on which Weeks has served since 1979 and Leonard since 1992. (Montanye Rule 56.1 Stmt. ¶¶ 1–3.) During the time period relevant to this lawsuit, the remaining members of the Board were Town Supervisor Michael Frerichs, James Rogers and Peter Martin.[3] (*Id.* ¶ 4.) According to plaintiff, the Board is controlled by the Republican majority with Weeks, the chair of the Town Republican Committee, exerting significant political influence. (Lange Aff. ¶ 7.) Montanye has been Highway Department Superintendent for approximately fifteen years. (Montanye Rule 56.1 Stmt. ¶ 6.) Montanye is not a member of the Board and does not have the authority to vote on issues relating to the Town. (*Id.* ¶ 8.) According to plaintiff, however, Montanye is closely aligned politically and personally with Weeks. (Lange Aff. ¶ 7.) Plaintiff has been continuously employed by the Town, under the authority of the Board, from 1988 to the present, during which time she has managed the Town's Dial–A–Bus program ("DAB"). (*Id.* ¶ 9.) DAB is a government subsidized transportation program providing to Town residents for a nominal fee rides to various points in the Town. (*Id.* ¶ 11.) The DAB offices were located at the Highway Department until September 2001. (*Id.* ¶ 13; Lange Aff. ¶ 1.) In the former DAB offices, Montanye had to walk through plaintiff's office to access his own office. (Lange Aff. ¶ 4.) According to plaintiff, Montanye told the builder to design the offices that way so that Montanye and plaintiff could have "privacy." (*Id.*)

Plaintiff and Montanye enjoyed a close personal relationship from 1988 until at least 1995, and they and their respective families interacted socially on a number of occasions. (Montanye Rule 56.1 Stmt. ¶¶ 27–38.) Plaintiff alleges that beginning

---

1. The parties dispute whether the named defendants have been properly sued in their individual capacities in addition to their official capacities. *See infra* Part IV.

2. Defendant Montanye is represented separately from the Town defendants and has submitted his own memorandum in support of his motion for summary judgment.

3. Plaintiff claims that although Frerichs was Town Supervisor, Weeks effectively controlled the Board.

in 1994, Montanye made it clear that he sought to initiate a sexual relationship with her. (Lange Aff. ¶ 6.) Plaintiff recounts a number of alleged incidents that indicated Montanye's desire to commence this type of relationship. For example, Montanye would leave numerous personal gifts and cards for Lange, calling her his "special lady" and "sweet pea." (*Id.*, Ex. 1.) In at least one card, he wrote that he would "always love" her.[4] (*Id.*) Plaintiff discusses two incidents in which Montanye attempted to kiss her. (*Id.* ¶ 6.) At a dance in November 1994, Montanye kissed plaintiff while they were dancing together. (Pl. Counter Rule 56.1 Stmt. ¶ 13.) Plaintiff responded by asking him if he was "crazy." (*Id.*) The next day, plaintiff explained to Montanye that his advances were unwelcome and that they were nothing more than "really good friends." (*Id.* ¶ 14.) In late 1995, in their shared office, Montanye again tried to kiss plaintiff while she was looking for papers in a filing cabinet. (*Id.* ¶ 15.) Plaintiff claims that she pushed him away several times and asked him to "leave [her] alone." [5] (*Id.*) Plaintiff states that after Montanye attempted to kiss her this second time, she would never stay at the office alone when he was there. (*Id.* ¶ 20.) Plaintiff alleges that after she rebuffed his advances, Montanye told her that he was "going to get even" with her, that he was "used to having his way" and that he would "turn the Town Board against [her]." (*Id.*) Montanye first made this alleged threat in 1996 and repeated it frequently through early 2000. (Lange Aff. ¶ 7.) Plaintiff did not tell anyone about Montanye's attempts to kiss her for three years. (Pl. Counter Rule 56.1 Stmt. ¶ 21; Lange Dep. at 272.) According to plaintiff, she believed that if Montanye just left her alone, everything would be fine. (Lange Dep. at 272.)

In late 1997, prompted by increasing concern over Montanye's threats of reprisal, and a training session on sexual harassment, plaintiff approached Weeks to discuss her concerns. (Lange Aff. ¶ 9.) At that time, Weeks served as the liaison between DAB and the Board. (*Id.* ¶ 8.) According to plaintiff, Weeks told her that he didn't want to discuss the matter, and that she should try to work things out with Montanye. (*Id.* ¶ 9.) Plaintiff also alleges that he told her at that time that she should "remember it is [Montanye's] highway garage you are working out of." [6] (*Id.*) Plaintiff also claims to have spoken to Rogers in late 1997 concerning her problems with Montanye. (*Id.* ¶ 11.) Rogers allegedly told her that because Montanye was an independent elected official he could do what he wanted, and suggested that she speak to Weeks who "controlled the Town Board." (*Id.*; Lange Dep. at 192.) When plaintiff informed Rogers that she had already spoken to Weeks, Rogers offered no alternative. (Lange Aff. ¶ 11.) In November 1998, at the suggestion of another Board member, Peter Martin, plaintiff had lunch with Leonard, a female Board member. (Pl. Rule 56.1 Stmt. ¶¶ 35, 38.) Plaintiff showed Leonard notes and gifts that Montanye had given her, and informed Leonard that Montanye had forced himself on her in 1995. (*Id.* ¶ 38.) Plaintiff told Leonard that she wanted the

---

4. Plaintiff concedes that she also left personal cards for Montanye saying he was "special" and signed "with love." (Lange Dep. at 546–64.) Plaintiff explains that, at the time, she "loved him like a brother." (*Id.* at 283.) Plaintiff also claims that Montanye would "get nasty" if she didn't respond to his cards. (*Id.* at 546.)

5. According to Montanye, the kiss Lange describes was a "co-initiated" goodnight kiss. (Montanye Dep. at 66–67.)

6. Weeks denies ever having had a conversation with plaintiff about her problems with Montanye. (Weeks Dep. at 32.)

Board to move her office. (*Id.*) According to plaintiff, Leonard told her she would bring the matter to the Board and help extricate plaintiff from the situation. (*Id.* ¶ 39.) However, Leonard admittedly took no action to follow up on plaintiff's complaint and did not inform any of the Board members. (*Id.* ¶ 44.) According to Leonard, because of prior conduct that she had witnessed, she did not believe plaintiff was being truthful in her allegations concerning Montanye. (Leonard Dep. at 16.) For example, Leonard states that on one occasion, she saw plaintiff drape herself across Montanye and run her hand down his arm. (*Id.*) Plaintiff denies that this ever occurred. (Pl. Rule 56.1 Stmt. ¶ 45.) After this meeting, plaintiff called Leonard numerous times but never got a response. (*Id.* ¶ 46.) When Martin later asked Leonard what she thought about the "DAB situation," she replied "don't go there." (Martin Dep. at 44.)

Plaintiff claims that after she spoke to Weeks in late 1997, Montanye made it clear through his actions that he intended to retaliate against her. For example, she alleges that he manipulated his workers so that they would refuse to assist DAB with needed repairs. (Lange Aff. ¶¶ 13, 15, 22.) Plaintiff claims that this impeded her ability to serve the public. (*Id.* ¶ 22.) Plaintiff also explains that from the start of her employment, she had relied on Montanye to keep her informed on concerns and issues before the Board. (*Id.* ¶ 10.) After she spoke to Weeks, however, communications from Montanye stopped. (*Id.* ¶ 10.) On January 21, 1998, plaintiff claims that Montanye asked her how she felt about not getting any information about what was going on in the Town. When she re-

plied that she didn't like being kept in the dark, he replied "you know why it's like this now." (*Id.*) He also prevented her from borrowing one of the Highway Department's pick-up trucks. (*Id.* ¶ 17.) Montanye allegedly told plaintiff: "Until you change, this is how things will be." (*Id.* ¶ 18.) In addition, although she and Montanye had historically hired secretaries jointly, Montanye began hiring secretaries without her input in 1998. (*Id.* ¶ 21.) Plaintiff claims that these secretaries worked exclusively with Montanye and did not assist her with DAB work, depriving her of needed assistance and causing her to work longer hours.[7] (*Id.* ¶¶ 21, 23.)

Beginning in 1997, two years after she had rebuffed Montanye's advances, plaintiff maintains that she felt the Board gradually turn against her.[8] (Lange Dep. at 273.) Among other things, plaintiff alleges that Board members would not respond to her calls or memos, embarrassed her at meetings and interrupted her when she was speaking. (*Id.* at 145.) On one occasion, for example, Weeks was observed becoming "very loud and very vocal" publically about apparent problems with DAB. (Pl. Rule 56.1 Stmt. ¶ 64.) According to Frerichs, this was the first time in eight years that he saw Weeks express anger towards plaintiff. (Frerichs Dep. at 16.) On another occasion, plaintiff claims that Weeks embarrassed her in front of the Board by asking her questions that she wasn't prepared to answer. (Lange Dep. at 195.) Plaintiff also discusses a situation in which Weeks asked her to attend a DAB meeting at a senior center. (Lange Aff. ¶ 12.) At the meeting, one senior

---

**7.** Montanye asserts that he hired a secretary unilaterally in order to separate the functions of the Highway Department and DAB. (Montanye Dep. at 117.)

**8.** In her Rule 56.1 Counter Statement, plaintiff alleges that she noticed the Board turning against her between 1996 and 1998. However, there is no evidence or allegations in the record of any Board action taken against her until 1997.

citizen called her a liar while Weeks stood by silently. (*Id.*)

Plaintiff alleges that after she complained about Montanye, the DAB department stopped getting notice of Town events, causing her to miss Town meetings and parties. (Lange Aff. ¶ 28.) For example, plaintiff claims that in December 1998, the DAB department did not receive word of a Christmas party to which Town employees were invited. (Lange. Dep. at 234.) The invitation was posted on a bulletin board in the Highway Department lunchroom which was not frequented by DAB employees. (*Id.* at 236.) In addition, plaintiff claims that she wasn't allowed to apply unused sick days from previous years although some other employees were permitted to do so.[9] (*Id.* at 154–80.) She also claims that the Board failed to raise DAB drivers' salaries to the going rate, making it difficult for her to operate her department. (*Id.* at 152–53.)

On June 7, 2000, plaintiff's attorney, Michael Sussman, wrote to Frerichs expressing his concern with plaintiff's difficulties at work "due to her refusal to become sexually involved with another Town employee." (*Id.*, Ex. 2.) A meeting was held on June 23, 2000 with plaintiff, Sussman, Frerichs and Town Attorney Kevin Dowd. Sussman explained the unwelcome gifts and cards that plaintiff had received from Montanye, as well as his threats to sever her relationship with the Board. Plaintiff pointed out instances of hostile behavior by the Board and asked to be physically separated from Montanye. (*Id.* ¶ 42.) Frerichs responded that he felt the matter was serious and would look into it. (*Id.*) On July 19, 2000, Dowd wrote a letter to Sussman in which he stated that, following the June 23 meeting, the Board held a special session followed by a conversation with Montanye and an additional executive session. (*Id.*, Ex. 4.) Dowd explained that the Board wished to dispel plaintiff's perception that the Board was against her, and invited her to participate in an executive session to discuss DAB matters. (*Id.*) Dowd also stated that the Board at times had been dissatisfied with operational problems of DAB and offered to provide plaintiff with extra training. (*Id.*) This suit followed.[10]

## DISCUSSION

### I. *Summary Judgment Standard*

Under FED. R. CIV. P. 56, summary judgment may be granted where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56(c); *Anderson v. Liberty Lobby*, 477 U.S. 242, 247–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The burden rests on the movant to demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A genuine factual issue exists if there is sufficient evidence favoring the nonmovant for a reasonable jury to return a verdict in his favor. *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.

---

**9.** Plaintiff attempted to apply unused sick days in March 2001. (*Id.* at 157.) The Employee Handbook, effective January 29, 1999, stated that unused sick days could not be carried over from one year to the next. (*Id.* at 155.) This policy applied to all employees. (*Id.* at 158.) Plaintiff claims there was retaliation because she was never told in 1999 that she lost unused sick days accrued since 1988. (*Id.*)

**10.** Plaintiff discusses other events that occurred after the bringing of this lawsuit. However, plaintiff never made any attempt to file a supplemental complaint pursuant to FED. R. CIV. P. 15(d) setting forth occurrences that have happened since the filing of the Complaint. These allegations will thus be disregarded. However, these allegations would not effect the outcome of this opinion.

In deciding whether summary judgment is appropriate, the court resolves all ambiguities and draws all permissible factual inferences against the movant. *See id.* at 255, 106 S.Ct. 2505. To defeat summary judgment, the nonmovant must go beyond the pleadings and "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The court's role at this stage of the litigation is not to decide issues of material fact, but to discern whether any exist. *See Gallo v. Prudential Residential Servs., L.P.,* 22 F.3d 1219, 1224 (2d Cir. 1994). Furthermore, in deciding a summary judgment motion in an action based on workplace discrimination, a district court "must proceed cautiously because . . . allegations usually require inquiry into the employer's true motivation for and subjective intent in making the challenged employment decision." *Kodengada v. Int'l Bus. Mach. Corp.,* 88 F.Supp.2d 236 (S.D.N.Y.2000) (citing *Patrick v. LeFevre,* 745 F.2d 153, 159 (2d Cir.1984)) (additional citation omitted). However, the plaintiff may not "defeat a motion for summary judgment by offering purely conclusory allegations of discrimination, absent any concrete particulars." *Meiri v. Dacon,* 759 F.2d 989, 998 (2d Cir.1985).

## II. *Statute of Limitations*

The instant action was filed on August 3, 2000. The limitations period for claims arising under § 1983 and N.Y. EXEC. L. § 296 is three years from the date the claim accrues. *Paige v. Police Dep't of Schenectady,* 264 F.3d 197, 199 n. 2 (2d Cir.2001); *Koerner v. State,* 62 N.Y.2d 442, 478 N.Y.S.2d 584, 467 N.E.2d 232 (1984). Plaintiff does not allege any overt acts of sexual behavior that occurred after August 3, 1997. In her deposition testimony, plaintiff is asked whether there were any acts of sexual harassment occurring within the three-year period before this suit was brought:

Q: Is there anything by way of sexual harassment that occurred since August 3, 1997, that you're suing for in this lawsuit?

A: No.

(Lange Dep. at 126.) Although plaintiff claims to have been retaliated against during the limitations period for rejecting Montanye's sexual advances, plaintiff does not allege any present or continuing acts of sexual behavior. *See Fitzgerald v. Henderson,* 251 F.3d 345, 364–65 (2d Cir. 2001) (no continuity between unwanted sexual overtures and harassment for rejecting these proposals); *see also United Air Lines v. Evans,* 431 U.S. 553, 558, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977) (untimely discriminatory act has no present legal consequences without a present violation); *Burrell v. City Univ. of N.Y.,* 894 F.Supp. 750 (S.D.N.Y.1995) (continuation of the effects of a discriminatory act does not amount to a continuing violation). Furthermore, despite defendants' argument that plaintiff's sexual harassment claims are untimely (Town Defs. Mem. Supp. Summ. J. at 2), plaintiff presents no argument as to why Montanye's sexual overtures should be considered as having occurred within the limitations period. Thus, Montanye's alleged sexual advances towards plaintiff may not be considered in determining the legal sufficiency of plaintiff's claims.

## III. *Retaliation Following Complaints of Sexual Harassment Under § 1983*

Plaintiff's central claim is that defendants retaliated against her for complaining about Montanye's acts of sexual harassment. (Complt. ¶ 29.) Claims of retaliation following complaints of sexual harassment are explicitly recognized under

Title VII.[11] 42 U.S.C. § 2000e–3(a).[12] Plaintiff, however, brings her claim pursuant to § 1983. The Second Circuit has explained that a plaintiff cannot use § 1983 to circumvent Title VII's limits on damages and shorter period of limitations. *See Saulpaugh v. Monroe Cmty. Hosp.*, 4 F.3d 134, 143 (2d Cir.1993) ("[P]laintiff cannot use Section 1983 to gain perceived advantages not available to a Title VII claimant ...."). However, "a plaintiff may assert a claim under Section 1983 if some law other than Title VII is the source of the right alleged to have been denied." *Id.; see also Carrero v. New York City Housing Auth.*, 890 F.2d 569, 575 (2d Cir. 1989) (§ 1983 claim not precluded by Title VII when based on substantive rights distinct from Title VII). In the instant action, plaintiff grounds her § 1983 claims on defendants' alleged violations of her rights under the Equal Protection Clause. (Complt.¶ 29.) Because Equal Protection, not Title VII, is the distinct right alleged to have been denied, plaintiff may assert her claims under § 1983. *Carrero*, 890 F.2d at 575. However, defendants' alleged retaliation in response to plaintiff's sexual harassment complaints is not cognizable as an equal protection violation. In a recent Second Circuit case, the court refused to recognize a claim of retaliation for complaints of racial discrimination under the equal protection clause. *Bernheim v. Litt*, 79 F.3d 318, 323 (2d Cir.1996). As the Second Circuit explained, "[a]lthough claims of retaliation are commonly brought

under the First Amendment [13] ... and may also be brought under Title VII ... we know of no court that has recognized a claim under the equal protection clause for retaliation following complaints of racial discrimination." *Id.; see also Ratliff v. DeKalb County*, 62 F.3d 338, 340–41 (11th Cir.1995) (no established right under the equal protection clause to be free from retaliation for complaints of gender discrimination); *Gray v. Lacke*, 885 F.2d 399, 414 (7th Cir.1989) ("[R]ight to be free from retaliation for protesting sexual harassment and sex discrimination is a right created by Title VII, not the equal protection clause.").

Plaintiff maintains that the cases cited by defendants in support of their argument that the Fourteenth Amendment does not recognize her retaliation claims are inapposite. (Pl. Mem. Opp. Summ. J. at 31.) In both *Moche v. City Univ. of New York*, 781 F.Supp. 160, 168 (E.D.N.Y.1992), and *Ericson v. Meriden*, 113 F.Supp.2d 276 (D.Conn.2000), the court held that a claim of retaliation following an employee's filing of a complaint under Title VII was remedied through Title VII and not the equal protection clause under § 1983. Without citing any legal authority, or any reason for drawing a distinction, plaintiff argues that because she did not file a Title VII charge, the legal conclusions in *Ericson* and *Moche* are inapplicable. (Pl. Mem. Opp. Summ. J. at 32.) We disagree. To hold otherwise would allow plaintiff to

---

**11.** Plaintiff has not complied with Title VII's procedural requirements. *See* 42 U.S.C. § 2000e–5(e); *see also Fitzgerald*, 251 F.3d at 359 (if claimant failed to pursue Title VII claim in administrative proceeding, district court generally lacks jurisdiction to hear the claim).

**12.** This subsection provides: "It shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because he has opposed any practice

made an unlawful employment practice by this subchapter ...."

**13.** Plaintiff does not assert any claim under the First Amendment. Furthermore, the allegations in this action would not support a First Amendment violation because plaintiff's complaints were based on her individual employment situation and did not address system-wide discrimination as a matter of public concern. *Saulpaugh*, 4 F.3d at 143.

avoid the limitations of Title VII by declining to file an administrative complaint under Title VII, or by simply framing her earlier informal complaints as invoking her right to equal protection rather than her rights under Title VII. Such a result would implicate the concerns addressed in *Carrero* by permitting municipal and state employees to "thwart the administrative requirements of [Title VII's] remedial scheme." 890 F.2d at 575. Moreover, the Second Circuit in *Bernheim* did not recognize a distinction between complaints under Title VII and complaints alleging equal protection violations. 79 F.3d at 323. Based on Second Circuit precedent, and plaintiff's failure to provide any legal authority to support the contention that there is a claim under the Fourteenth Amendment for retaliation following complaints of sexual harassment, we hold that the equal protection clause does not recognize plaintiff's claim in this respect.[14] Because plaintiff does not bring this claim pursuant to any other constitutional or statutory right, her § 1983 retaliation claim must be dismissed.

## IV. *Retaliation for Rebuffing Sexual Advances*

Although plaintiff may not assert an equal protection claim for defendants' alleged retaliation in response to her complaints of sexual harassment, it is unclear whether plaintiff can maintain an equal protection claim against Montanye for retaliation following her rejection of his sexual advances.[15] As one court in this Circuit recently explained, "[n]either the Second Circuit, nor any other circuit court, has ruled on whether resisting an employer's sexual advances constitutes 'protected activity' for purposes of estab-

lishing retaliation." *Little v. NBC,* 210 F.Supp.2d 330, 385 (S.D.N.Y.2002) (citing cases). The court in *Little* further explained that district courts in this Circuit are split on the issue, but that the majority of courts in other districts have held that an employee's refusal to submit to sexual advances constitutes "protected activity." *Id.* (citing cases). For purposes of this motion, we agree with the court's reasoning in *Little*—that resisting sexual harassment is a means of opposing unlawful conduct, *id.* at 385–86—and hold that plaintiff engaged in a protected activity when she rebuffed Montanye's advances. Nonetheless, because plaintiff can bring suit against Montanye only in his official capacity, her claim under this theory cannot survive summary judgment.

■ It is unclear from the Complaint whether the named defendants are sued only in their official capacities, or in their individual capacities as well. The Complaint names Montanye only in his official capacity as Highway Department Superintendent of the Town and fails to indicate that suit is being brought against him individually. However, the prayer for relief seeks punitive damages against the individual defendants, which would be unavailable if they were sued only in their official capacities. (Complt. at V(d).) More importantly, however, Montanye was not properly served as an individual. FED. R. CIV. P. 4(e) provides that service on individuals can be obtained: (1) pursuant to the law of the state where the district court is located, or (2) "by delivering a copy of the summons and of the complaint to the individual personally or by leaving copies thereof at the individual's dwelling

---

14. Plaintiff does not allege that this alleged retaliation was otherwise based on gender.

15. Plaintiff has not suggested, nor produced any evidence to show, that Weeks or Leonard directly retaliated against her for rebuffing Montanye's sexual advances.

house or usual place of abode ... or by delivering a copy of the summons and of the complaint to an agent authorized by appointment or by law to receive service of process." Under New York law, service on an individual may be effected by personal service, N.Y.C.P.L.R. 308(1), or "by delivering the summons ... at the actual place of business, dwelling place or usual place of abode of the person to be served and by mailing the summons to the person to be served at his or her last known residence or ... at his or her actual place of business." N.Y.C.P.L.R. § 308(2).

■ The affidavit of service on Montanye shows that service was made on him as Highway Superintendent through the Town Clerk's Office only without being mailed to his residence or place of business, a method insufficient to effectuate service on him in his individual capacity. (DeGiuseppe Aff., Ex. A; Montanye Aff. ¶¶ 3–5.) In his Answer, Montanye raised lack of personal jurisdiction as an affirmative defense. (Montanye Answer ¶ 30.) Plaintiff does not argue that Montanye was properly served. Instead, plaintiff claims that under New York law, defendant is somehow deemed to have waived this defense by appearing in this lawsuit and failing to file a motion to dismiss.[16] (Pl. Mem. Opp. Summ. J. at 25–26.) However, this Court can find no authority for the proposition that Montanye waived an affirmative defense asserted in his Answer by not filing an earlier motion to dismiss. To the contrary, other courts in this Circuit, without requiring a prior motion to dismiss, have granted summary judgment for improper service when defendants

raised "personal jurisdiction" as an affirmative defense in their Answer. *See Moultry v. City of Poughkeepsie*, 154 F.Supp.2d 809, 812 (S.D.N.Y.2001). Furthermore, despite Montanye's assertion of this defense, plaintiff has taken no action to cure the defective service. (Montanye Reply Mem. Supp. Summ. J. at 3.) Nor has plaintiff shown "good cause" for failing to effectuate proper service on Montanye in his individual capacity. FED. R. CIV. P. 4(m); *see Moultry*, 154 F.Supp.2d at 812. Thus, any claims against Montanye in his individual capacity must be dismissed.[17]

■ In order to proceed with her retaliation claim against Montanye in his official capacity, plaintiff must show that the alleged retaliation visited upon her for rebuffing his sexual advances was done pursuant to an official policy, custom or practice. *Monell v. New York City Dep't of Social Servs.*, 436 U.S. 658, 690–91, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *see also Dwares v. City of New York*, 985 F.2d 94, 100 (2d Cir.1993). Where no municipal policy exists, "liability may nonetheless arise from 'a course of action tailored to a particular situation' by a municipal decision maker, provided that 'the decision maker possesses final authority to establish municipal policy with respect to the action ordered.'" *Legal Aid Soc'y v. City of New York*, 114 F.Supp.2d 204, 231 (S.D.N.Y.2000) (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986)). Thus, to determine whether plaintiff can proceed against Montanye in his official capacity, this Court must determine whether Mon-

---

**16.** Plaintiff claims to base this argument on N.Y.C.P.L.R. 320(b). However, this rule states that appearance confers jurisdiction unless plaintiff objects to jurisdiction by motion or in the answer. *Id.* Furthermore, N.Y.C.P.L.R. 3211(a) cited by plaintiff simply provides that a defendant **may** move to dismiss for lack of personal jurisdiction.

**17.** Although we would be inclined to allow plaintiff an opportunity to cure the defective service, as explained below, plaintiff would not have a valid retaliation claim against Montanye in his individual capacity.

tanye has final policymaking authority in the particular area involved. *Jeffes v. Barnes*, 208 F.3d 49, 57 (2d Cir.2000); *see also Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989). Although Montanye may have had political influence on the Board, it is indisputable that he did not have final policymaking authority with respect to the Board's actions. (Montanye Rule 56.1 Stmt. ¶ 8 (Montanye did not serve on the Board and did not vote on Board matters).) Although plaintiff does not develop this argument, the only area in which Montanye arguably had final policymaking authority was within the Highway Department. The only conduct implicating Montanye's authority over the Highway Department is plaintiff's allegation that he prevented his mechanics from servicing DAB buses. (Pl. Mem. Opp. Summ. J. at 21.)

 While Montanye's conduct with respect to his mechanics' servicing of DAB buses may have been stressful for plaintiff, it does not rise to the level of an "adverse employment action" required for a *prima facie* retaliation claim. *Reed v. A.W. Lawrence & Co., Inc.*, 95 F.3d 1170, 1177 (2d Cir.1996). A plaintiff sustains an adverse employment action if he or she endures a "materially adverse change" in the terms and conditions of employment. *Honey v. County of Rockland*, 200 F.Supp.2d 311, 319 (S.D.N.Y.2002) (citing *Richardson v. New York State Dep't of Corr. Servs.*, 180 F.3d 426, 446 (2d Cir.1999)). "To be 'materially adverse' a change in working conditions must be 'more disruptive than a mere inconvenience or an alteration of job responsibilities.'" *Id.* (quoting *Crady v.*

*Liberty Nat'l Bank and Trust Co.*, 993 F.2d 132, 136 (7th Cir.1993)). "A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices ... unique to a particular situation." *Id.* (quoting *Crady*, 993 F.2d at 136). Furthermore, "mere nastiness of colleagues or supervisors, or unprofessional behavior, is ... not considered adverse employment action for purposes of § 1983." *Carlucci v. Kalsched*, 78 F.Supp.2d 246, 256 (S.D.N.Y.2000) (citing *Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 713 n. 3 (2d Cir.1996)). Based on these standards, plaintiff is unable to show how Montanye's alleged refusal to have Highway Department mechanics service DAB buses resulted in a "materially adverse" change in her working conditions.[18] Thus, to the extent that plaintiff claims retaliation following her rejection of Montanye's sexual advances, this claim must be dismissed. Summary judgment on plaintiff's retaliation claims is granted in favor of defendants.

## V. Sexual Harassment Claims

### A. Quid Pro Quo Harassment

 The Second Circuit has held that claims of sexual harassment, brought under the equal protection clause, are actionable under § 1983. *Saulpaugh*, 4 F.3d at 144 ("[S]exual harassment of women constitutes disparate treatment because of gender and is actionable under Section 1983."). As stated above, however, *see*

---

**18.** Even if actions done in his individual capacity were taken into consideration, none of the acts rise to the level of an adverse employment action. Although the lack of assistance from secretarial staff on DAB matters and Montanye's failure to communicate with her on Town issues would have been understandably frustrating, there is no indication that they resulted in a materially adverse change sufficient to establish an adverse employment action.

*infra* Part II., any claim based on actual acts of sexual harassment is time-barred. To the extent that plaintiff alleges that she suffered a tangible employment action within the limitations period as a result of *quid pro quo* harassment, this claim cannot survive. As defendants point out, a *quid pro quo* harassment claim requires that the harasser be the plaintiff's supervisor. *Kotcher v. Rosa and Sullivan Appliance Center, Inc.*, 957 F.2d 59, 62 (2d Cir.1992) (under *quid pro quo* theory, plaintiff must establish that she was denied an economic benefit because she rejected a sexual advance by a supervisor); *Rivera v. Edenwald Contracting Co., Inc.*, No. 93 Civ. 8582, 1996 WL 240003, at *3 (S.D.N.Y.1996) (*quid pro quo* harassment "by its very nature, [requires] the plaintiff [to] show that the sexual advance was made by a supervisor."). Montanye, however, was not plaintiff's supervisor, nor did he have the authority to alter the terms of her employment. *See Karibian v. Columbia Univ.*, 14 F.3d 773, 777 (2d Cir.1994) ("[T]he *quid pro quo* harasser, by definition, wields the employer's authority to alter the terms and conditions of employment . . . ."). Plaintiff makes an unsubstantiated declaration that Montanye's formal authority over her is irrelevant as long as he had the political clout to turn her actual supervisor, the Board, against her. (Pl. Mem. Opp. Summ. J. at 21.) This contention, unsupported by any legal authority, is unconvincing. Moreover, simply because Montanye had the ability to effect plaintiff's working environment does not, as plaintiff contends, raise an issue of fact as to whether Montanye was plaintiff's supervisor. (*Id.* at 29; *but cf. Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 759, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998) ("If, in the unusual case, it is alleged there is a false impression that the actor was a supervisor, when he in fact was not, the victim's mistaken conclusion must be a reasonable one.").) Adverse conduct by a co-worker will inevitably affect the working environment of the employee against whom the actions are directed regardless of the co-worker's status. *See Burlington*, 524 U.S. at 762, 118 S.Ct. 2257 ("[a] co-worker can break a co-worker's arm as easily as a supervisor," but only a supervisor can take tangible employment action); *id.* at 760, 118 S.Ct. 2257 (tangible employment action "requires an official act of the [company]"). For these reasons, plaintiff is unable to make out a *quid pro quo* sexual harassment claim and this claim must be dismissed.

## B. *Hostile Work Environment* [19]

■ A plaintiff may state a claim under § 1983 for improper sexual conduct that creates a hostile work environment. *Cohen v. Litt*, 906 F.Supp. 957, 963 (S.D.N.Y.1995) (citing *Saulpaugh*, 4 F.3d at 143–44). However, there are no clearly articulated standards in this Circuit with respect to hostile work environment claims under § 1983. *Id.* Without clear instruction on matter, Title VII provides "significant guidance." *Id.* (citing *Bohen v. City of East Chicago, Ind.*, 799 F.2d 1180, 1185–86 (7th Cir.1986)). Adapting the standards of Title VII to the equal protection clause, it has been held that a plaintiff makes out a equal protection hostile work environment claim by showing (1) intentional harassment, (2) based on sex, (3) under color of state law, that is (4) sufficiently extensive to render the work environment hostile to plaintiff. *Cohen*, 906 F.Supp. at 964.

---

**19.** Plaintiff does not expressly make a hostile work environment claim in her Complaint. However, based on the factual allegations in the Complaint, as well as her argument in opposition to the instant motion, (*see* Pl. Mem. Opp. Summ. J. at 27), plaintiff is deemed to have alleged a claim based on hostile work environment.

**424**

Construing the facts in the light most favorable to plaintiff, as we must, plaintiff alleges unwelcome behavior directed against her under color of state law. However, other than alleging that individual Board members retaliated against her for complaining of sexual harassment, which we have already held is not actionable under the equal protection clause, *see infra* Part III., plaintiff provides no basis from which to infer that the Board's conduct was directed against her on the basis of gender. Although the Board members may have been influenced by their personal and political connections to Montanye, this is insufficient to establish a constitutional violation. Thus, the allegedly retaliatory actions of the Board may not form the basis for a hostile work environment claim under § 1983. On the other hand, plaintiff sufficiently alleges that Montanye's conduct towards her was motivated by her rejection of his sexual advances—an action arguably based on gender. *See infra* Part IV. It is thus necessary to consider whether Montanye's conduct created a hostile work environment for plaintiff.

Whether an environment is sufficiently hostile or abusive to support a hostile work environment claim must be "measured by the totality of the circumstances, including the frequency and severity of the discriminatory conduct, whether such conduct is physically threatening or humiliating, and whether the conduct unreasonably interferes with the plaintiff's work performance." *Kodengada,* 88 F.Supp.2d 236 (S.D.N.Y.2000) (citing *Williams v. County of Westchester,* 171 F.3d 98, 100 (2d Cir.1999)). The basis for hostile environment claims extends beyond tangible economic loss. *Meritor Sav. Bank v. Vinson,* 477 U.S. 57, 64, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). The test is "whether 'the harassment is of such quality or quantity that a reasonable employee would find the conditions of her employment *altered for the worse.'*" *Whidbee v. Garzarelli Food Specialties, Inc.,* 223 F.3d 62, 70 (2d Cir.2000) (quoting *Torres v. Pisano,* 116 F.3d 625, 632 (2d Cir.1997)) (emphasis in *Whidbee*). "The incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." *Carrero,* 890 F.2d at 577.

Montanye's sexual advances towards plaintiff did not occur within the limitations period. *See infra* Part II. Although plaintiff need not show that she was subject to overt sexual behavior; *see Raniola v. Bratton,* 243 F.3d 610, 617 (2d Cir.2001) (hostile work environment claim not limited to sexual advances or sexual behavior), plaintiff is unable to show that the allegedly retaliatory conduct directed against her by Montanye was "sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment." *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). Montanye's actions did not exhibit the same level of frequency, offensiveness or abuse that other courts have found sufficient to make out a hostile work environment claim. *See, e.g., Fitzgerald,* 251 F.3d at 362–63 (question for jury on hostile work environment claim when supervisor subjected plaintiff every day to a stream of unjustified criticisms on her work, berated her about hours and productivity, attempted to force her to work overtime, criticized her when she worked scheduled overtime and treated her more harshly than males and other female employees with whom he had a sexual relationship); *Raniola,* 243 F.3d at 621 (issue of fact on hostile work environment claim when plaintiff subjected to offensive sex-based remarks, disproportionately burdensome work assignments, workplace sabotage and a serious public threat of physical harm); *Howley v. Town of Stratford,* 217 F.3d 141, 153–56 (2d Cir.

2000) (triable issue of fact on hostile work environment claim where woman firefighter subjected to barrage of sexually explicit and degrading insults in the presence of her subordinates, affecting her ability to lead); *Schwapp v. Town of Avon,* 118 F.3d 106, 112 (2d Cir.1997) (triable issue of fact on hostile work environment claim when based on repeated racial jokes and epithets). In her most serious allegations against Montanye, plaintiff claims that he unilaterally hired a secretary that did not assist her with DAB functions, prevented his mechanics from working on DAB buses, threatened to turn the Board against her and refused to communicate with her concerning issues affecting the Town. (Lange Aff. ¶¶ 3, 7, 10, 21.) Although Montanye's actions may have contributed to making plaintiff's working environment more difficult and uncomfortable, taken together they do not meet the threshold of severity or pervasiveness required for a hostile work environment claim. *Harris,* 510 U.S. at 21, 114 S.Ct. 367; *see also Faragher v. City of Boca Raton,* 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) (conduct must be extreme to support a hostile environment claim). Moreover, plaintiff admits that her relationship with Montanye improved after 1998. (Lange Dep. at 229.) Plaintiff does not cite any case in which similar conduct was held sufficient to create an issue of fact on a hostile work environment claim. In fact, plaintiff cites no legal authority in support of her argument that she was subjected to a hostile work environment. (Pl. Mem. Opp. Summ. J. at 21–25.) We conclude that, because plaintiff has not met the threshold for establishing a triable issue of fact on her hostile work environment claim, this claim is dismissed. Summary judgment is granted in favor of defendants on plaintiff's sexual harassment claims.[20]

## CONCLUSION

Although plaintiff may have had a valid legal claim if this action had been commenced at an earlier date or under a different legal theory, and although we find Montanye's alleged conduct reprehensible, the claims presented are insufficient as a matter of law. Defendants' motions for summary judgment are therefore granted and the Complaint is dismissed.

SO ORDERED.

**20.** Plaintiff also brings a claim under N.Y. Exec. L. § 296. However, because this law mirrors Title VII, *Torres,* 116 F.3d at 629 n. 1 (claims under New York's Human Rights Law are analytically identical to claims under Title VII) and because this Court has rejected plaintiff's claims under both forms of sexual harassment recognized by Title VII, *see Tomka v. Seiler Corp.,* 66 F.3d 1295, 1304–05 (2d Cir.1995) (*quid pro quo* and hostile work environment harassment violate Title VII), plaintiff's state law claims must be dismissed as well.