**Gordon URQUHART, Plaintiff,**

v.

**METROPOLITAN TRANSPORTATION AUTHORITY, Elliot Sander, Wiliam Morange, Kevin McConville and Terrance Culhane, Defendants.**

No. 07 Civ. 3561(DAB).

United States District Court, S.D. New York.

Sept. 25, 2013.

322

Deanna R. Waldron, Steven J. Hyman, Janet Cohn Neschis, Jonathan Robert Jeremias, McLaughlin and Stern, LLP, Norman H. Siegel, Siegel Teitelbaum & Evans LLP, Rachel Dara Nicotra, Law Office of Rachel Nicotra, New York, NY, for Plaintiff.

Craig Robert Benson, Stephen Andrew Fuchs, Elias Jay Kahn, Littler Mendelson, P.C., New York, NY, Keith Jay Rosenblatt, Littler, Mendelsohn, P.C., Newark, NJ, for Defendants.

### MEMORANDUM AND ORDER

DEBORAH A. BATTS, District Judge.

Plaintiff Gordon Urquhart ("Plaintiff" or "Urquhart"), an African–American male, together with eight African–American plaintiffs and one Hispanic plaintiff, all of whom are current or former employees of the Metropolitan Transportation Authority ("MTA") Police Department ("MTA PD"), commenced this action against MTA and four MTA executive officers (collectively, "Defendants"), alleging violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, the New York State Human Rights Law ("NYSHRL"), the New York City Human Rights Law ("NYCHRL"), and 42 U.S.C. §§ 1981 and 1983. Plaintiff maintains that the MTA discriminated against him on the basis of his race by denying him division assignments, case and project assignments, and related overtime, subjecting him to a hostile work environment, engaging in a pattern or practice of racial discrimination, and retaliating against him for complaining to superiors and the New York State Division of Human Rights ("SDHR") about alleged discrimination. Defendants now move pursuant to Fed.R.Civ.P. 56 for Summary Judgment on each of Plaintiff's claims.[1]

For the reasons set forth herein, Defendants' Motion for Summary Judgment is GRANTED in its entirety.

### I. FACTUAL BACKGROUND

#### A. The Parties

Defendant MTA is a New York State public benefit corporation that provides public transportation services to the Greater New York City area. Defendant Elliot Sander served as the Executive Director and Chief Executive Officer of MTA from January 1, 2007 to May 7, 2009. Defendant William Morange was MTA Director of Security from July 2003 to December 2010. Defendant Kevin McConville was the Chief of MTA PD from October 2005

---

**1.** In a Scheduling Order dated September 24, 2010, the Court allowed separate Motions for Summary Judgment to be submitted for each individual Plaintiff in this action. This Memorandum and Order addresses only the Motion for Summary Judgment filed with respect to the claims instituted by Plaintiff Gordon Urquhart.

to January 2008. Defendant Terrance Culhane was an Assistant Deputy Chief of MTA PD from 2004 to July 2010.

Plaintiff Gordon Urquhart joined the Long Island Railroad Police Department ("LIRR PD") in 1981 and was appointed Detective in 1990. (Pl.'s 56.1 Stmt. ¶¶ A–B.) Urquhart never took the Sergeant's examination and remained a Detective until he retired in 2006. (Defs.' 56.1 Stmt. ¶¶ 16–17.) In 1997, the New York State Legislature created MTA, and on January 1, 1998, all employees of the LIRR PD, including Plaintiff, were transferred to MTA PD. (*Id.* ¶ 7.)

### B. Plaintiff's Employment with LIRR PD

Plaintiff Urquhart alleges that he was discriminated against and subjected to racially derogatory behavior from early on in his career. For example, when Plaintiff brought his Caucasian wife to work in 1990, his supervisor allegedly slammed a door in their faces. (Pl.'s 56.1 Stmt. ¶ C.) Urquhart also alleges that over a three- to six-month period in 1991, a Detective told him three jokes in which the word "nigger" was the punchline. (Urquhart Dep. 62:9–67:20.) In the mid–1990s, Urquhart allegedly complained to a superior that Defendant Culhane gave him worse assignments than Caucasian officers and created a hostile work environment. (*Id.* 87:8–9, 90:12–15, 91:24–92:20.) The superior learned from others that Culhane showed "favoritism" in distributing case assignments and overtime and subsequently chastised Culhane for his favoritism. (Masciana Dep. 47:1–48:18, 49:17–50:9.) Plaintiff alleges that in 1997, he was involuntarily transferred to the Corporate Security offices. (Urquhart Decl. ¶ 9.)

### C. Plaintiff's Employment with MTA PD

In 1999, Plaintiff was first transferred to the Applicant Investigations Unit ("AIU")

and then to MTA's Headquarters. (Pl.'s 56.1 Stmt. ¶ N.) In 2000, Urquhart was transferred to the Detective Squad and assigned to District 3—Hillside Support Facility ("HSF"), where he claims he was subjected to excessive discipline and denied favorable assignments, overtime, and training opportunities on the basis of his race. (*Id.* ¶¶ O–V, AA–DD.) He also alleges that supervisors made racially disparaging comments about him and other African–American employees (*Id.* ¶¶ W–Z), and notes that he was repeatedly told that Detective Sergeants Pete Cummo and Kim Riley had referred to him as "crazy" (Urquhart Dep. 315:16–317:7). During his time at HSF, Plaintiff complained to Lieutenant Timothy Harmon, Detective Mark Landro, and Detective Sergeant Kim Riley that cases associated with high overtime were being steered to Caucasian Detective James Flanagan. (Harmon Dep. 177:15–25; Landro Dep. 143:19–144:11; Urquhart Decl. ¶ 32; Urquhart Dep. 53:23–54:3; *see* Jeremias Decl. Ex. G, at D00025424.) Plaintiff alleges that some of these complaints were made in Flanagan's presence. (Urquhart Decl. ¶ 32.) His complaints were discussed with Police Benevolent Association ("PBA") Vice President Vincent Provenzano. (Cummo Dep. 441:21–442:2; Harmon Dep. 179:4–23.)

In 2001, Urquhart was assigned to an office in Central Islip with slower internet access, where he was allegedly isolated from his command and supervisors, given unfavorable case and vehicle assignments, excessively disciplined, and subjected to a hostile work environment due to his race. (Pl.'s 56.1 Stmt. ¶¶ EE–LL.) After a disciplinary meeting, he was transferred from the Detective Squad to the AIU, where he was allegedly unable to investigate cases and make arrests. (*Id.* ¶¶ LL–NN.)

In 2002, Urquhart applied for and was transferred to the Joint Infrastructure

Task Force ("JITF"). (*Id.* ¶ PP.) After the JITF was disbanded in April 2003, Urquhart returned to the Detective Squad and was assigned to District 3–Jamaica. (Pl *Id.* ¶¶ QQ–RR.) Allegedly, he was again isolated and denied favorable case assignments and overtime. (*Id.* ¶¶ RR–SS.) Twice in August 2003, Plaintiff complained about this treatment to PBA representatives, but he was not told to make a formal grievance. (*Id.* ¶¶ TT–UU.)

In late 2003, JITF was "reformulated" as the Interagency Counterterrorism Task Force ("ICTF"). (*Id.;* Pucillo Dep. 14:13–14.) Plaintiff alleges that Caucasians formerly assigned to JITF were invited to join ICTF without having to undergo a formal application and interview process, but he did not receive such an invitation. (Pl.'s 56.1 Stmt. ¶¶ WW, YY.) Instead, Plaintiff submitted an abstract and interviewed for ICTF in response to a September 2003 Interim Order. (*Id.* ¶ XX.) Allegedly, the head of ICTF, Captain Ernest Pucillo, told Plaintiff that he had failed the interview and would not be assigned to ICTF. (*Id.* ¶ XX.) Urquhart alleges that he immediately told a PBA representative that he intended to file a lawsuit to protest the discriminatory denial of his ICTF application. (*Id.* ¶ AAA.) Plaintiff was transferred to ICTF in late November 2003, allegedly because of the PBA's intervention, and was placed in one of ICTF's "outside commands": the New York/New Jersey High Intensity Drug–Trafficking Area ("HIDTA") program. (*Id.* ¶¶ BBB, DDD; Fuchs Decl. Ex. 6; Urquhart Decl. ¶ 29.) Urquhart claims that he subsequently requested to transfer from HIDTA to another ICTF outside command, the Joint Terrorism Task Force ("JTTF"), and that this request was denied (Urquhart

Decl. ¶ 29; Urquhart Dep. 109:20–24). However, Plaintiff stated in his deposition that he requested the HIDTA assignment and never asked to leave HIDTA (Urquhart Dep. 232:24–233:4).

### D. Alleged Denial of ICTF Assignments and Overtime

HIDTA Detectives received some assignments directly from ICTF and others from HIDTA. (Pl.'s 56.1 Stmt. ¶ DDD; Defs.' Resp. to Pl.'s 56.1 Stmt. ¶ DDD.) Detective Sergeant Flanagan was responsible for assigning and distributing ICTF assignments (Flanagan Decl. ¶ 10), while Plaintiff's HIDTA assignments were determined by his HIDTA command officer, a member of the New York Police Department ("NYPD") (Ojeda Decl. ¶ 6). Plaintiff alleges that he was never assigned an ICTF case (Urquhart Dep. 195:5–6), an allegation that Defendants dispute (Defs.' Reply to Pl.'s Resp. to Defs.' 56.1 Stmt. ¶ 33). He further alleges that although Flanagan told him that he would not assign ICTF cases to ICTF members in outside commands, he assigned ICTF cases to Daniel Ojeda, a HIDTA member who is not African–American.[2] (Pl.'s 56.1 Stmt. ¶¶ DDD, GGG.) Ojeda admits that he was assigned to at least four ICTF cases (Ojeda Decl. ¶¶ 10–11), Plaintiff alleges that an additional five ICTF cases were assigned to Ojeda (Pl.'s 56.1 Stmt. ¶ GGG), and the ICTF case log suggests one further ICTF assignment (Jeremias Decl. Ex. I, at 22). Flanagan's alleged refusal to assign Plaintiff ICTF cases cost Plaintiff considerable overtime. (Pl.'s 56.1 Stmt. ¶ DDD.) Defendants allege that ICTF Detectives working full-time at outside commands rarely received ICTF cases. (Defs.' Resp. to Pl.'s 56.1 Stmt.

---

**2.** Plaintiff alleges that Ojeda is white and represents himself as white (Urquhart Dep. 192:15–18), but Ojeda affirms that he is Hispanic and identifies himself as such (Ojeda Decl. ¶ 2).

¶ DDD.) If such Detectives were assigned ICTF cases, it was typically because an ICTF Detective working at ICTF Headquarters was unavailable or needed assistance. (*Id.* ¶ DDD.) Defendants allege that Plaintiff declined a significant amount of overtime, including "on-call time," coverage time, and other occasional ICTF assignments for which he was eligible (Defs.' 56.1 Stmt. ¶ 32); Plaintiff disputes this allegation (Pl.'s Resp. to Defs.' 56.1 Stmt. ¶¶ 32R–33R, 36R).

Plaintiff also alleges that, like Ojeda, six Caucasian Detectives assigned to ICTF outside commands received ICTF cases and related overtime: Anthony D'Angelis, Raymond Godas, Marc Noens, Agostino Paratore, Michael Pizzo, and Joseph Trimarchi. (Pl.'s 56.1 Stmt. ¶¶ EEE–FFF.) Defendants respond that these individuals were not similarly situated to Urquhart, citing to the following facts. (Defs.' Resp. to Pl.'s 56.1 Stmt. ¶ EEE.) D'Angelis was assigned to NYPD Counterterrorism (*id.* ¶ JJJ), Godas allegedly did not begin his assignment at HIDTA until late 2005 or early 2006 (*id.* ¶ EEE), and Noens and Paratore were assigned to JTTF (*id.* ¶ BBB). Pizzo was assigned to the Intelligence ("Intel") Unit in Nassau/Suffolk Counties, which Defendants allege was a less active assignment that permitted Pizzo to be physically present at ICTF Headquarters more frequently than Urquhart. (*Id.* ¶ EEE.) Allegedly, Trimarchi was not assigned to an outside command on an ongoing basis. (*Id.* ¶ EEE.)

In 2004, Plaintiff earned fewer overtime hours than Noens and Ojeda, and earned more overtime hours than D'Angelis, Paratore, and Trimarchi. (Jeremias Decl. Ex. S.) [3] In 2005, Plaintiff earned fewer overtime hours than Godas, Noens, Ojeda, and Pizzo, and earned more overtime hours than D'Angelis, Paratore, and Trimarchi. (Jeremias Decl. Ex. T.) In 2006, Plaintiff earned fewer overtime hours than Godas, Noens, and Ojeda, and earned more overtime hours than D'Angelis, Paratore, and Pizzo. (Jeremias Decl. Ex. U.) Plaintiff alleges that Paratore told him that he did not want to work overtime. (Pl.'s 56.1 Stmt. ¶ LLL.)

### E. Alleged Denial of Project Assignments and Overtime

Plaintiff also argues that he was unjustly denied "special projects" and "administrative security projects." (Pl.'s Am. Mem. Opp'n Defs.' Mot. Summ. J. ("Pl.'s Opp'n") 10.) "Special projects," assigned by Pucillo to ICTF members, lasted weeks or months and related to training, conferences, or field exercises. (Pl.'s 56.1 Stmt. ¶ HHH; Pucillo Dep. 147:13–20.) Plaintiff alleges that he was rarely allowed to work on a special project, unless it was offered to the entire ICTF. (Pl.'s 56.1 Stmt. ¶ HHH.) In contrast, he alleges that Detectives Adam Jutze, Henry Micyk, and Pizzo were assigned more special projects than he was, and as a result, earned more overtime than he did during certain years. (Pl.'s Opp'n 10; Pl.'s 56.1 Stmt. ¶¶ III–KKK.) Defendants argue that Jutze and Micyk, who worked at ICTF Headquarters, and Pizzo, who worked in the Intel Unit, were not similarly situated to Plaintiff. (Pl.'s 56.1 Stmt. ¶¶ EEE, III–JJJ; Defs.' Resp. to Pl.'s 56.1 Stmt. ¶¶ EEE, III–JJJ.)

Detective Charles Wendel, Caucasian, worked on administrative security projects, such as putting together the "ICTF Daily," a bulletin comprised of summaries of ICTF Detectives' cases. (Pl.'s Opp'n 10; Pl.'s 56.1 Stmt. ¶ NNN.) When Wendel

---

**3.** As Plaintiff points out, the following Detectives are not appropriate comparators for the purposes of analyzing overtime earned in 2004, because they joined ICTF in July 2004: Godas, Keyla Hammam, Henry Micyk, and Pizzo. (Pl.'s Resp. to Defs.' 56.1 Stmt. ¶ 35R.)

was unavailable, the "ICTF Daily" project was given to an MTA PD Detective–Sergeant and Charles Chaves, who was not an MTA PD employee. (Pl.'s 56.1 Stmt. ¶ 000.) Defendants allege that Wendel, who had more seniority than Urquhart, was uniquely qualified for these projects because of his technology-related training and expertise. (Defs.' 56.1 Stmt. ¶ 34; Flanagan Decl. ¶ 4.) Plaintiff, however, alleges that he had extensive technological skill, and his 2003 ICTF abstract states that he had experience designing computer systems and databases for MTA PD. (Pl.'s 56.1 Stmt. ¶ OOO.)

### F. Plaintiff's Complaint to the State Division of Human Rights

On June 28, 2006, Plaintiff filed a Complaint against MTA with the SDHR. (Pl.'s 56.1 Stmt. ¶ QQQ; Defs.' 56.1 Stmt. ¶ QQQ.) Although he states that he was isolated from ICTF and the Detective Division prior to filing the complaint, he alleges that after the filing he became even more isolated from ICTF and his HIDTA colleagues. (Pl.'s 56.1 Stmt. ¶¶ QQQ–RRR.) Specifically, ICTF stopped asking Urquhart to gather information from the other agencies located at the HIDTA command, and instead had ICTF members such as Ojeda reach out to Urquhart's agency contacts directly. (Id. ¶ RRR; Urquhart Dep. 417:14–418:25.)

### G. Plaintiff's Retirement from MTA PD

Plaintiff retired from MTA PD in December 2006, allegedly due to the isolation and racial hostility he experienced throughout his career. (Pl. 56.1 Stmt. ¶ SSS.)

## II. DISCUSSION

### A. Legal Standard for Summary Judgment

A court should grant summary judgment when there is "no genuine dispute as to any material fact" and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a); see also Allianz Ins. Co. v. Lerner, 416 F.3d 109, 113 (2d Cir. 2005). Genuine issues of material fact cannot be created by conclusory allegations. Victor v. Milicevic, 361 Fed.Appx. 212, 214 (2d Cir.2010). Summary judgment is appropriate only when, after drawing all reasonable inferences in favor of a non-movant, no reasonable juror could find in favor of that party. Melendez v. Mitchell, 394 Fed.Appx. 739, 740 (2d Cir.2010).

In assessing when summary judgment should be granted, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Id. (citation omitted). The non-movant may not rely upon speculation or conjecture to overcome a motion for summary judgment. Burgess v. Fairport Cent. Sch. Dist., 371 Fed.Appx. 140, 141 (2d Cir. 2010). Instead, when the moving party has documented particular facts in the record, "the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." FDIC v. Great Am. Ins. Co., 607 F.3d 288, 292 (2d Cir.2010). Establishing such evidence requires going beyond the allegations of the pleadings, as the moment has arrived "to put up or shut up." Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir.2000) (citation omitted). Thus, unsupported allegations in the pleadings cannot create a material issue of fact. Id.

### B. Disparate Treatment Based on Race

#### 1. Title VII and NYSHRL Claims

Courts in this Circuit analyze Title VII and NYSHRL claims of employ-

ment discrimination according to the three-stage, burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *Simmons v. Akin Gump Strauss Hauer & Feld, LLP,* 508 Fed.Appx. 10, 12 (2d Cir.2013). Under *McDonnell Douglas,* a plaintiff bears the initial, *de minimis* burden of establishing a *prima facie* case of discrimination. *Beyer v. Cnty. of Nassau,* 524 F.3d 160, 163 (2d Cir.2008). To make out a *prima facie* case, a plaintiff must demonstrate, through direct or circumstantial evidence, that: (1) he is a member of a protected class; (2) he was qualified for the position; (3) he suffered from an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of discrimination. *Holcomb v. Iona Coll.,* 521 F.3d 130, 138 (2d Cir.2008). A plaintiff may raise such an inference by showing that his employer subjected him to disparate treatment, that is, treated him less favorably than a similarly situated employee outside of his protected group. *Ruiz v. Cnty. of Rockland,* 609 F.3d 486, 493 (2d Cir.2010).

■ A plaintiff who makes out a *prima facie* case establishes a presumption of discrimination, at which point the burden of production shifts to the defendant to articulate a "legitimate, non-discriminatory reason" for the challenged conduct. *Woodman v. WWOR–TV, Inc.,* 411 F.3d 69, 76 (2d Cir.2005) (citation omitted). If the defendant produces such a reason, the plaintiff must then, without the benefit of the presumption of discrimination, "raise[ ] sufficient evidence upon which a reasonable jury could conclude by a preponderance of the evidence that the [adverse employment action] was based, at least in part," on discrimination. *Holcomb,* 521 F.3d at 141. Typically, plaintiffs who lack direct evidence of discrimi-

nation argue that the employer's stated reason for the challenged conduct is pretextual. *Id.* "[I]n many cases, a showing of pretext, when combined with a prima facie case of discrimination, will be enough to permit a rational finder of fact to decide that the decision was motivated by an improper motive." *Id.* However, a showing of pretext is not required. *Id.* at 141–42. Instead, a plaintiff "alleging that an employment decision was motivated both by legitimate and illegitimate reasons may establish that the impermissible factor was a motivating factor, without proving that the employer's proffered explanation was not some part of the employer's motivation." *Id.* at 142.

■ Title VII's statute of limitations bars claims based on events occurring more than 300 days prior to filing a charge of discrimination with a state or local employment agency. 42 U.S.C. § 2000e–5(e)(1). Plaintiff filed an administrative complaint with the SDHR on June 28, 2006. (Fuchs Decl. Ex. 2.) Accordingly, only those incidents that occurred on or after September 1, 2005 are actionable under Title VII. *Patterson v. Cnty. of Oneida,* 375 F.3d 206, 220 (2d Cir.2004) (noting that Title VII precludes recovery for discrete discriminatory acts that occurred outside the statutory time period even if other acts occurred within the time period). Discrimination claims under the NYSHRL are subject to a three-year statute of limitations. *Lange v. Town of Monroe,* 213 F.Supp.2d 411, 418 (S.D.N.Y. 2002). As this action was brought on May 4, 2007, only those incidents occurring on or after May 4, 2 004 are actionable under the NYSHRL. Nonetheless, earlier incidents may be cited as background evidence in support of a timely Title VII or NYSHRL claim. *Anderson v. Nassau Cnty. Dep't of Corr.,* 558 F.Supp.2d 283, 299 (E.D.N.Y.2008).

Here, Urquhart alleges that MTA violated Title VII and the NYSHRL by denying him favorable case and project assignments and corresponding overtime on the basis of his race.[4]

First, Plaintiff argues that Defendants denied him ICTF cases and corresponding overtime on the basis of race. Assuming *arguendo* that Plaintiff has established a *prima facie* case of race discrimination, Defendants have set forth a legitimate, nondiscriminatory reason for any discrepancy in ICTF assignments: Plaintiff allegedly declined ICTF overtime opportunities, including "on-call time."[5] (Defs.' Mem. 9.) Defendants' only admissible[6] supporting evidence for their claim is Ojeda's statement that in December 2003, Urquhart discouraged him from accepting on-call time and coverage time. (Ojeda Decl. ¶ 7.) However, Plaintiff denies this allegation, and further states that he was never offered the opportunity to perform on-call overtime and does not recall turning down any overtime opportunities. (Urquhart Decl. ¶¶ 34–35; Urquhart Dep. 213:19–20.) Urquhart's testimony raises an issue of material fact as to whether he turned down ICTF overtime opportunities.

However, the possibility that Defendants' rationale is pretextual, in combination with the remainder of the record, could not convince a reasonable jury that the alleged disparity in ICTF case assignments and corresponding overtime was based, even in part, on discrimination. *See Zimmermann v. Assocs. First Capital Corp.*, 251 F.3d 376, 381 (2d Cir.2001)

4. Although Plaintiff's Amended Complaint alleges that Defendants denied him training on the basis of his race (Am. Compl. ¶¶ 110–11), the Court deems Plaintiff to have abandoned any training-related Title VII, NYSHRL, or NYCHRL disparate treatment claims against MTA or Defendants in their official capacities. Defendants' Memorandum in Support of their Motion for Summary Judgment specifically addresses these claims. (Defs.' Rev. Mem. Law Supp. Summ. J. 4 n. 8.) Plaintiff's Opposition brief, however, fails to make any arguments in support of these claims; instead, Plaintiff mentions denial of training only in the context of his §§ 1981/1983 and NYSHRL/NYCHRL aiding-and-abetting claims. (Pl.'s Opp'n 23 & n. 40, 24–25.) "[A]rguments not made in opposition to a motion for summary judgment are deemed abandoned." *Plahutnik v. Daikin Am., Inc.*, 912 F.Supp.2d 96, 104 (S.D.N.Y.2012); *see also Jain v. McGraw–Hill Cos., Inc.*, 827 F.Supp.2d 272, 280 (S.D.N.Y.2011) (holding that plaintiff abandoned six claims when her opposition papers failed to respond to defendants' arguments on those claims); *Senno v. Elmsford Union Free Sch. Dist.*, 812 F.Supp.2d 454, 468 (S.D.N.Y.2011) ("Plaintiff did not address this argument in his opposition papers, which operates as an abandonment of the argument."). In addition, it is unclear whether Plaintiff seeks for the alleged refusal to assign him to JTTF to be construed as a violation of Title VII, the NYSHRL, and the NYCHRL. (*See* Pl.'s Opp'n 4–6.) If so, the claim is time-barred because the alleged refusal occurred in November 2003 (Pl.'s 56.1 Stmt. ¶ BBB; Fuchs Decl. Ex. 6), well before the relevant statutes of limitations.

5. In their Reply brief, Defendants argue, for the first time, that Urquhart left work earlier in the day than other ICTF members and accordingly was not assigned to unplanned ICTF opportunities that arose in the afternoon. (Defs.' Reply Mem. Supp. Mot. Summ. J. 4.) "It is well established, however, that a court should not 'consider arguments that are raised for the first time in a reply brief,'" and this Court will not do so here. *Mateo v. Bristow*, No. 12 Civ. 5052, 2013 WL 3863865, at *8 (S.D.N.Y. July 16, 2013) (quoting *Clubside, Inc. v. Valentin*, 468 F.3d 144, 159 n. 5 (2d Cir.2006)).

6. The statement of Keyla Hammam that Defendants cite is inadmissible pursuant to Fed. R.Evid. 602, because no evidence has been introduced sufficient to support a finding that she has personal knowledge of whether Urquhart refused non-HIDTA assignments. (Hammam Decl. ¶ 10.) Ojeda's statement that Urquhart did not accept coverage time and on-call time is also inadmissible pursuant to Fed. R.Evid. 602. (Ojeda Decl. ¶¶ 7–8.)

("[T]he issue as to the sufficiency of the evidence is whether the record as a whole, including whatever reasonable inference the jury could draw from the proffer of a false reason for the discharge, permitted the required ultimate finding of discrimination."). Plaintiff's primary evidence of discrimination is his testimony that Flanagan told him that personnel in outside commands would not be assigned to ICTF cases, his testimony that he was never assigned to an ICTF case,[7] Pucillo's testimony that HIDTA members could and sometimes did receive ICTF assignments, Plaintiff's allegation that Ojeda is and identifies himself as Caucasian, and the testimony, declarations, ICTF case log, and payroll records that suggest that Ojeda received approximately eleven ICTF assignments during his time at HIDTA. (Pl.'s 56.1 Stmt. ¶ GGG; Pl.'s Resp. to Defs.' 56.1 Stmt. ¶ 29R; Jeremias Decl. Ex. H, at D00027758, D00027996, D00028102, D00028111, D00028141, D00028206, D00028214, D00028389; Ex. I, at D00026929, D00026931; Ojeda Decl. ¶ 10; Pucillo Dep. 150:5–151:2; Urquhart Decl. ¶¶ 28, 32; Urquhart Dep. 192:15–18, 193:9–11, 195:5–9, 401:3–8.) Plaintiff also affirms (without citing to any specific ICTF assignments other than Ojeda's) that other ICTF members assigned to outside commands were assigned to ICTF cases. (Urquhart Decl. ¶ 32.) Plaintiff also notes that he worked fewer overall overtime hours than some Caucasian ICTF members assigned to outside commands (Pl.'s 56.1 Stmt. ¶¶ III–KKK).

Although the evidence submitted could convince a reasonable jury that Urquhart received fewer ICTF assignments than some similarly situated ICTF members who were not members of Plaintiff's protected class, it is not sufficient to permit a reasonable jury to find by a preponderance of the evidence that any disparity was based in part on race. Plaintiff does not provide any evidence that Flanagan assigned ICTF cases on the basis of race, nor does he provide any other evidence sufficient to raise an issue of material fact as to race discrimination.

■■■ Next, Plaintiff claims that he was denied "special projects" and resultant overtime on the basis of race. This claim rests entirely on the allegations that Jutze, Micyk, and Pizzo received more special project assignments and earned more total overtime than Urquhart. (Pl.'s Opp'n 10–11.) However, Plaintiff makes no effort to demonstrate the extent of the disparity, or whether the disparity even existed. To prove that Jutze, Micyk, and Pizzo received special project assignments, Plaintiff merely cites to Jeremias Decl. Ex. H. (Pl.'s Opp'n 10.) Exhibit H is a voluminous collection of weekly payroll records that include columns for the number of overtime hours worked, overtime codes, and comments/explanations. (Jeremias Decl. Ex. H.) The Parties fail to make clear which of the overtime codes or comments/explanations correspond to special project assignments,[8] and Plaintiff does

---

7. This testimony is disputed by Defendants. Defendants cite to two specific instances in which, they allege, Urquhart was assigned to ICTF cases (Fuchs Decl. Ex. 7, at D00028034, D00028077; *see also* Jeremias Decl. Ex. I, at D00026917–18; Ojeda Decl. ¶ 11), and note that Urquhart worked more overtime hours than some Caucasian ICTF members assigned to outside commands (Defs.' Resp. to Pl.'s 56.1 Stmt. ¶¶ JJJ–KKK). Indeed, the ICTF

case log, as translated by Plaintiff, suggests that Urquhart was assigned to six ICTF cases, and Caucasian ICTF members D'Angelis, Godas, Noens, Paratore, Pizzo, and Trimarchi were assigned to, respectively, one, fifty-four, one, zero, fifty-seven, and six ICTF cases. (Pl.'s Resp. to Defs.' 56.1 Stmt. ¶ 29R; Jeremias Decl. Ex. I.)

8. In his response to Defendants' 56.1 Statement, Plaintiff states that, on payroll records,

not cite to any particular pages that might indicate the assignment of special projects to Jutze, Micyk, and Pizzo. "It is the duty of the parties, not the court, to sift through the record and bring to the court's attention the pertinent information that may create or defeat a triable issue of fact." *Charter Oak Fire Ins. Co. v. Tri–County Fire & Safety Equip. Co.,* 636 F.Supp.2d 193, 197 (E.D.N.Y.2009) (citation and alteration omitted); *see also Johnson v. City of New York,* No. 10 Civ. 6294, 2012 WL 1076008, at *3 (S.D.N.Y. Mar. 28, 2012) ("[P]articularly where a party is not proceeding pro se, Rule 56 'does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute.'") (quoting *Amnesty Am. v. Town of W. Hartford,* 361 F.3d 113, 121 (2d Cir.2004)). Without any specific citations to particular facts, Plaintiff's allegations "amount to nothing more than generalized assertions." *Khaleel v. FJC Sec. Svcs., Inc.,* No. 10 Civ. 5030, 2012 WL 3957928, at *4 (E.D.N.Y. Aug. 6, 2012). "Mere speculation and conclusory allegations of discrimination are insufficient to meet plaintiff's burden of establishing a prima facie case." *Id.*

However, even had Plaintiff established a *prima facie* case of discrimination, Defendants have set forth legitimate, nondiscriminatory reasons why Plaintiff might have been assigned fewer special projects than Jutze, Micyk, and Pizzo. Namely, Plaintiff's availability was dictated by the needs of the HIDTA Unit, unlike that of Jutze, Micyk, and Pizzo, who were not assigned to HIDTA. (Defs.' Mem. 10, 17; Defs.' Reply Mem. Supp. Mot. Summ. J. ("Defs.' Reply") 4 n. 10; Defs.' Resp. to Pl.'s 56.1 Stmt. ¶¶ III–JJJ; Flanagan Reply Decl. ¶ 9.) The record does not contain evidence from which a reasonable juror could find that this rationale is pretextual. Urquhart himself testified that ICTF members working at Headquarters were distinguishable from, and generally received different assignments than, ICTF members assigned to outside commands. (Urquhart Dep. 198:21–199:5.) And although he notes that another HIDTA member, Ojeda, was assigned special projects, Plaintiff points out only one special project assigned to Ojeda. (Pl.'s 56.1 Stmt. ¶ GGG (citing Jeremias Decl. Ex. H, at D00027758).)

Nor could a reasonable jury find by a preponderance of the evidence that the alleged disparity in special project assignments was motivated by race. Plaintiff's primary evidence of discrimination is the unspecified alleged disparity in the number of special projects assigned to him and three Caucasian ICTF members (Pl.'s Opp'n 10; Pl.'s 56.1 Stmt. ¶ HHH), Pucillo's description of special projects (Pl.'s 56.1 Stmt. ¶ HHH), and the fact that Plaintiff earned fewer total overtime hours than Jutze (in 2004, 2005, and 2006), Micyk (in 2005 and 2006), Pizzo (in 2005), and other Caucasian ICTF Detectives. (Pl.'s 56.1 Stmt. ¶¶ III–KKK; Jeremias Decl. Exs. S–U.) However, in 2004 and 2005, Plaintiff earned more overtime than Caucasian

---

special projects are designated "P" and ICTF cases are designated "TF." (Pl.'s Resp. to Defs.' 56.1 Stmt. ¶ 29R.) However, in his own 56.1 Statement, Plaintiff states that he was assigned to the project "PR Day Parade." (Pl.'s 56.1 Stmt. ¶ HHH (citing Fuchs Decl. Ex. 7, at D00027901).) On payroll records, this project is not designated "P." Instead, Urquhart's payroll record lists it as "PR Day Parade" and Pizzo's payroll record lists it as "Project 06–044 P/R Day Parade." (Fuchs Decl. Ex. 7, at D00027901.) Nor are ICTF cases designated "TF" consistently. Plaintiff and Ojeda identify as ICTF cases the following six assignments that are not designated "TF" on payroll records: "Invest 05–034"; "Invest 05–181"; "Invest 05–187"; "S.I. Drill"; "Case 06–82"; and "TT 06–199." (*See* Pl.'s 56.1 Stmt. ¶ GGG; Ojeda Decl. ¶ 10.)

ICTF Detectives D'Angelis, Paratore, and Trimarchi, and in 2006, Plaintiff earned more overtime than D'Angelis, Paratore, and Pizzo. (Jeremias Decl. Exs. S–U.) Co-plaintiff Kenneth Davis, African–American, was the second highest overtime earner out of nine ICTF Detectives in 2004, fourth of thirteen in 2005, and eighth of twelve in 2006. (Jeremias Decl. Exs. S–U.) The only other African–American ICTF Detective, Keyla Hammam, was the sixth highest overtime earner out of thirteen ICTF Detectives in 2005 and fifth of twelve in 2006. (Jeremias Decl. Exs. S–U.) Taken together, this evidence does not permit a reasonable juror to find that MTA assigned Plaintiff fewer projects because of his race.

 Last, Plaintiff alleges that MTA denied him "administrative security projects" and resultant overtime on the basis of race, and instead, assigned those projects to Detective Wendell. Assuming *arguendo* that Plaintiff has put forth a *prima facie* case of discrimination, Defendants have introduced legitimate, nondiscriminatory reasons for their conduct. They allege that the administrative security projects Wendel was assigned were technology-related, and that Wendell had relevant technological experience and training. (Defs.' Mem. 10–11.) In addition, Defendants note that Wendel was the most senior Detective in MTA PD, and allege that no other MTA PD member was assigned similar projects. (*Id.*) Finally, they state that Wendel was not assigned to HIDTA. (*Id.* 10.)

Plaintiff, however, has raised an issue of material fact as to whether all but the last of these rationales are false. Urquhart alleges that, like Wendel, he had extensive and relevant computer skills. (Pl.'s 56.1 Stmt. ¶ OOO.) Indeed, in the late 1990s, he worked with Wendel to design and implement a new department-wide computer system. (Urquhart Decl. ¶ 9.) Given that Urquhart identified his computer skills in his 2003 ICTF abstract, Pucillo ought to have had some awareness of his technological background. (Pl.'s 56.1 Stmt. ¶ OOO.) Plaintiff also challenges Defendants' assertion that Wendel was the only person assigned these projects, pointing out that the projects were assigned to Charles Chaves of the Triborough Bridge and Tunnel Authority or an MTA PD Detective–Sergeant when Wendel was unable to complete them. (Pl.'s 56.1 Stmt. ¶ OOO.) Finally, he alleges that seniority is only relevant to MTA's overtime assignments when the most senior person is Caucasian. (Urquhart Dep. 405:7–8.) As examples, he states that when he was the senior Detective at HSF, from 2000–2001, and at District 3—Jamaica, in 2003, he did not receive favorable overtime assignments. (Pl.'s 56.1 Stmt. ¶¶ O–P, RR–UU; Urquhart Dep. 407:3–7; 436:3–5; 439:11–13.) This evidence suggests that, although Plaintiff's HIDTA placement may have played a role in the assignment of administrative security projects, Defendants' other rationales may be pretextual.

However, no reasonable juror looking at the record could find that the disparity in assignment of administrative security projects was based in part on racial discrimination, even after taking into account this evidence of pretext. Plaintiff's primary evidence of discrimination is the disparity between Wendel and Plaintiff in administrative security project assignments, the allegation that those assignments went to Chaves and an unidentified Detective–Sergeant if Wendel could not complete them, Plaintiff's technological and writing skills, Pucillo's knowledge that Plaintiff had those skills, and the significant disparity in total overtime earnings between Plaintiff and Wendel. (Pl.'s 56.1 Stmt. ¶¶ NNN–OOO.) Plaintiff, however, does not indicate the

race of Chaves or even identify the Detective–Sergeant. (*Id.* ¶ OOO; Urquhart Decl. ¶ 36; Urquhart Dep. 206:3–13.) Nor does he indicate whether the Detective–Sergeant was a member of HIDTA or, like Wendel, worked at ICTF Headquarters. (*Id.*) This evidence, in the context of the record, could not permit a reasonable jury to find by a preponderance of the evidence that the disparity was based in part on race.

Accordingly, Defendants' Motion for Summary Judgment on Plaintiff's Title VII and NYSHRL disparate treatment claims is GRANTED.

### 2. NYCHRL Claims

The NYCHRL " 'explicitly requires an independent liberal construction analysis in all circumstances,' an analysis that 'must be targeted to understanding and fulfilling what the statute characterizes as the City HRL's uniquely broad and remedial purposes, which go beyond those of counterpart state or federal civil rights laws.' " *Bennett v. Health Mgmt. Sys., Inc.,* 92 A.D.3d 29, 34, 936 N.Y.S.2d 112 (N.Y.App. Div.2011) (citation omitted); *see also Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.,* 715 F.3d 102, 109 (2d Cir.2013) ("[C]ourts must analyze NYCHRL claims separately and independently from any federal and state law claims, construing the NYCHRL's provisions 'broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible.' ") (citation omitted).

 For an NYCHRL claim to survive a summary judgment motion,

> the plaintiff need only show that her employer treated her less well, at least in part for a discriminatory reason. The

employer may present evidence of its legitimate, non-discriminatory motives to show the conduct was not caused by discrimination, but it is entitled to summary judgment on this basis only if the record establishes as a matter of law that "discrimination play[ed] *no* role" in its actions.

*Id.* at 110 n. 8 (citation omitted). "[S]ummary judgment dismissing a claim under the NYCHRL should be granted only if 'no jury could find defendant liable under any of the evidentiary routes—*McDonnell Douglas,* mixed motive, direct evidence, or some combination thereof.' " *Melman v. Montefiore Med. Ctr.,* 98 A.D.3d 107, 113, 946 N.Y.S.2d 27 (N.Y.App.Div.2012) (citation omitted). However, these evidentiary routes are not applied identically to Title VII claims. For instance, "to make out the third prong of a prima facie case of discrimination under the NYCHRL, a plaintiff must simply show that she was treated differently from others in a way that was more than trivial, insubstantial, or petty." *Williams v. Regus Mgmt. Grp., LLC,* 836 F.Supp.2d 159, 173 (S.D.N.Y. 2011); *see also Lytle v. JPMorgan Chase,* No. 08 Civ. 9503, 2012 WL 393008, at *19 (S.D.N.Y. Feb. 8, 2012) (NYCHRL plaintiff "does not need to demonstrate that he was subject to a materially adverse employment action."), *adopted by* 2012 WL 1079964 (S.D.N.Y. Mar 30, 2012), *aff'd by* 518 Fed.Appx. 49 (2d Cir.2013).

Plaintiff has not raised an issue of material fact as to whether the alleged denial of favorable assignments and corresponding overtime was "caused at least in part by discriminatory ... motives."[9] *Mihalik,* 715 F.3d at 113. The evidence discussed *supra* Part II.B.1 and contained in the record does not meet Plaintiff's burden to

---

9. Because a three-year statute of limitations applies to NYCHRL claims, only those incidents occurring on or after May 4, 2004 are actionable here. N.Y. City Admin. Code § 8–502(d); *see Odom v. Doar,* 497 Fed.Appx. 88, 89 (2d Cir.2012).

show that the alleged disparities in ICTF case assignments, special project assignments, administrative security project assignments, and related overtime were motivated at least in part by a discriminatory reason. Accordingly, Defendants' Motion for Summary Judgment on Plaintiff's NYCHRL disparate treatment claims is GRANTED.

## C. Hostile Work Environment Claims

### 1. Title VII and NYSHRL Claims

 "In order to survive summary judgment on a claim of hostile work environment harassment, a plaintiff must produce evidence that 'the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment.'" *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 570 (2d Cir. 2000) (citation omitted). "A hostile working environment is shown when the incidents of harassment occur either in concert or with regularity that can reasonably be termed pervasive." *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 724 (2d Cir.2010) (citation omitted). "[A] hostile work environment can also be established through evidence of a single incident of harassment that is 'extraordinarily severe.'" *Id.* (citations omitted). "A work environment will be considered hostile if a reasonable person would have found it to be so and if the plaintiff subjectively so perceived it." *Brennan v. Metro. Opera Ass'n*, 192 F.3d 310, 318 (2d Cir.1999). Whether a reasonable person would find a given work environment hostile depends on the "totality of the circumstances," consideration of which includes: (1) frequency of the conduct, (2) severity of the conduct, (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance, and (4) whether the conduct unreasonably interferes with the employee's work performance. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). "Of course, 'it is axiomatic that mistreatment at work, whether through subjection to a hostile environment or through other means, is actionable under Title VII only when it occurs because of an employee's *protected characteristic*,' such as race" or because of a "prohibited factor," such as retaliation. *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 702 F.3d 685, 694 (2d Cir.2012) (citation and alterations omitted); *Terry v. Ashcroft*, 336 F.3d 128, 150 (2d Cir.2003) (holding that plaintiff had sufficiently demonstrated that the alleged hostile work environment was "based on a prohibited factor" because, *inter alia*, "a reasonable fact-finder could conclude ... that a retaliatory motive played a role in the creation of a hostile work environment").

 "[C]onsideration of the entire scope of a hostile work environment claim, including behavior alleged outside the statutory time period, is permissible for the purposes of assessing liability, so long as an act contributing to that hostile environment takes place within the statutory time period." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 105, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002). "[I]f 'any act falls within the statutory time period,' we need 'to determine whether the acts about which an employee complains are part of the same actionable hostile work environment practice.'" *McGullam v. Cedar Graphics, Inc.*, 609 F.3d 70, 76 (2d Cir. 2010) (quoting *Morgan*, 536 U.S. at 120, 122 S.Ct. 2061).

 Here, the acts falling within the statutory time period that Plaintiff alleges contributed to a hostile work environment are: Provenzano's alleged statement to Urquhart that Urquhart could not pursue his complaints with the PBA because case

assignments were not within the confines of the Collective Bargaining Agreement, Urquhart's claims that he was denied case assignments and corresponding overtime on the basis of race, his retaliation claims, and the perceptions of his co-plaintiffs. (Pl.'s Opp'n 11–16; Urquhart Decl. ¶ 39.) [10] As alleged, Provenzano's statement is neither hostile nor related to race. Moreover, even assuming Urquhart was denied case assignments, project assignments, and corresponding overtime, and had his job duties diminished, Plaintiff has not "alleged facts sufficient to allow a fact-finder to conclude that defendants' alleged hostility was based on a prohibited factor" such as race or participation in protected activity. *Terry*, 336 F.3d at 150; *see supra* Part II.B, *infra* Part II.D. Since Plaintiff has not raised an issue of material fact as to whether he experienced even one instance of discriminatory or retaliatory harassment, the Court need not consider the harassment that his co-plaintiffs may have faced. *See Cruz*, 202 F.3d at 570 ("[A] plaintiff *who herself experiences discriminatory harassment* need not be the target of other instances of hostility in order for those incidents to support her claim.") (emphasis added). Further, because no act contributing to Plaintiff's hostile work environment claim took place within the statutory time period, the Court need not consider incidents alleged outside the statutory time period. *Morgan*, 536 U.S. at 105, 122 S.Ct. 2061. Accordingly, Defendants' Motion for Summary Judgment on

Plaintiff's Title VII and NYSHRL hostile work environment claims is GRANTED.

### 2. NYCHRL Claim

 "In determining whether a claim of hostile work environment survives summary judgment" under the NYCHRL, "the relevant consideration is whether there is a triable issue of fact as to whether the plaintiff 'has been treated less well than other employees because of" his protected status. *Barounis v. N.Y.C. Police Dep't*, No. 10 Civ. 2631, 2012 WL 6194190, at *9 (S.D.N.Y. Dec. 12, 2012) (quoting *Williams v. N.Y.C. Hous. Auth.*, 61 A.D.3d 62, 872 N.Y.S.2d 27, 39 (App.Div.2009)). Thus, a plaintiff need not "show 'severe and pervasive' conduct to establish a hostile work environment claim" under the city statute. *Id.* "The NYCHRL, though, is not a 'general civility code' and 'petty slights and trivial inconveniences' are not actionable under it." *Id.* (quoting *Williams*, 872 N.Y.S.2d at 40–41). "As under Title VII, hostile work environment claims under [the NYCHRL] may be based on events outside the statute of limitations period to the extent they constitute 'part of the same actionable hostile work environment practice,' and at least one act contributing to the claim occurs within the filing period." *Gutierrez v. City of New York*, 756 F.Supp.2d 491, 501 (S.D.N.Y. 2010) (citation omitted).

 Here, Plaintiff has failed to raise a triable issue of fact as to whether he was treated less well than other employees be-

---

10. The opposition brief states that Provenzano made the following statements to Urquhart: "this is the way it is"; "you know how these people are"; "they can do what they want to." (Pl.'s Opp'n 16.) The paragraph of Plaintiff's response to Defendant's 56.1 Statement to which the brief cites for these allegations, however, states that these statements were made to Urquhart's co-plaintiffs. (Pl.'s Resp. to Defs.' 56.1 Stmt. ¶ 12R.) It also states

that Provenzano told Plaintiff that the alleged discrimination was "out of his hands." (Pl.'s Resp. to Defs.' 56.1 Stmt. ¶ 12R.) However, the sources the paragraph cites do not contain this quote. Accordingly, the Court assumes that Plaintiff intended to refer to his declaration, in which he states that Provenzano told him his complaints were outside the confines of the Collective Bargaining Agreement. (Urquhart Decl. ¶ 39.)

cause of his race or his engagement in protected activity. No juror considering the alleged acts falling within the statutory time period could conclude that he experienced any discriminatory or retaliatory harassment. "The broader remediation available under the City law does not allow the Plaintiff to dispense with linking his claim of hostility to some attitude that the law forbids." *Williams v. Metro–North Commuter R.R. Co.,* No. 11 Civ. 7835, 2012 WL 2367049, at *13 (S.D.N.Y. June 20, 2012). Accordingly, Defendants' Motion for Summary Judgment on Plaintiff's NYCHRL hostile work environment claim is GRANTED.

### D. Retaliation Claims

#### 1. Title VII and NYSHRL Claims

Plaintiff alleges that he suffered unlawful retaliation after complaining about race discrimination in 2000–2001 and late 2003 and after filing a formal Complaint with the SDHR on June 28, 2006. He claims that MTA retaliated against him for his complaints of discrimination by denying him ICTF cases and related overtime and isolating him from ICTF. Urquhart also alleges that MTA retaliated against him for filing the SDHR Complaint by lessening his job responsibilities, thereby isolating him and denying him overtime.

■ To establish a *prima facie* case of retaliation under Title VII and the NYSHRL, a plaintiff must establish by a preponderance of the evidence: (1) participation in a protected activity; (2) the defendant's knowledge of the protected activity; (3) a materially adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action. *Tepperwien v. Entergy Nuclear Operations, Inc.,* 663 F.3d 556, 568 n. 6 (2d Cir.2011). "[I]f the plaintiff meets this burden, the defendant employer must then articulate a legiti-

mate, non-discriminatory reason for its adverse employment action." *Id.* The Supreme Court has recently held that if the employer does so, the plaintiff "must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer" for his Title VII claim to survive. *Univ. of Tex. Sw. Med. Ctr. v. Nassar,* —— U.S. ——, 133 S.Ct. 2517, 2534, 186 L.Ed.2d 503 (2013). Although it is not yet clear whether the "but-for" standard applies to NYSHRL claims or whether Plaintiff need only "prove that retaliation was a substantial reason for the adverse action," *see Tepperwien,* 663 F.3d at 568 n. 6, the Court need not address which standard applies because Plaintiff's retaliation claims fail under either standard.

■ Assuming that Plaintiff has put forth a *prima facie* case that MTA denied him ICTF cases and related overtime in retaliation for the complaints of race discrimination he made when working at HSF in 2000–2001 and when initially denied entry to ICTF in late 2003, MTA has set forth a legitimate, nondiscriminatory reason for its conduct: Plaintiff declined ICTF overtime opportunities. As discussed *supra,* Urquhart has raised an issue of material fact as to the veracity of this reason. In order to demonstrate retaliation's role in the assignment of ICTF cases, Plaintiff primarily relies on evidence that (1) Flanagan, who assigned ICTF cases and overtime, was aware that Plaintiff had complained about him in 2000–2001; and (2) the alleged denial of ICTF overtime opportunities began within months of Plaintiff's 2003 complaint to the PBA. (Pl.'s Opp'n 18–19.) However, this evidence, even in combination with evidence of pretext, is insufficient to show that retaliation was a but-for cause of or played a substantial role in the disparity in ICTF overtime assignments.

Next, Plaintiff argues that MTA engaged in retaliation when it assigned him to a HIDTA office without another ICTF Detective in November 2003. (Pl.'s Opp'n 19.) This claim, however, is time-barred. *See* 42 U.S.C. § 2000e–5(e)(1); *Lange*, 213 F.Supp.2d at 418.

▓▓▓ Finally, even assuming that Plaintiff has established a *prima facie* case that his job duties were diminished in retaliation for filing the SDHR Complaint, no reasonable juror could find by a preponderance of the evidence that retaliation was a but-for cause of or played a substantial role in the alleged diminishment. Plaintiff's sole support for his claim is his own testimony that, after he filed the SDHR Complaint, Flanagan and other ICTF Detectives contacted outside agencies directly or assigned other HIDTA members to contact outside agencies; before the SDHR Complaint was filed, Urquhart was the liaison between ICTF and outside agencies. (Pl.'s Opp'n 19–20; Urquhart Decl. ¶ 32; Urquhart Dep. 417:9–20, 418:17–25.) Flanagan, however, testified that no such ostracizing occurred and that he was not aware of the SDHR Complaint until after Urquhart retired. (Flanagan Decl. ¶ 17.) Plaintiff's evidence is insufficient to meet the preponderance of the evidence test, particularly given his failure to put forth evidence that Flanagan or the other unidentified Detectives who bypassed him had knowledge of the Complaint. Accordingly, Defendants' Motion for Summary Judgment on Plaintiff's Title VII and NYSHRL retaliation claims is GRANTED.

### 2. NYCHRL Claims

▓▓▓ "[T]o prevail on a retaliation claim under the NYCHRL, the plaintiff must show that she took an action opposing her employer's discrimination, and that, as a result, the employer engaged in conduct that was reasonably likely to deter a person from engaging in such action." *Mihalik*, 715 F.3d at 112 (citations omitted). "[A] defendant is not liable if the plaintiff fails to prove the conduct is caused at least in part by … retaliatory motives, or if the defendant proves the conduct was nothing more than 'petty slights or trivial inconveniences.'" *Id.* at 113 (citations omitted).

Even after taking into account the NYCHRL's "uniquely broad and remedial purposes," no jury could find, based on the submitted evidence, that the alleged isolation and denial of cases and overtime were caused even partly by retaliatory motives. *See Williams*, 872 N.Y.S.2d at 31. Accordingly, Defendants' Motion for Summary Judgment on Plaintiff's NYCHRL retaliation claims is GRANTED.

### E. Pattern or Practice of Discrimination Claims

▓▓▓ Plaintiff maintains that Defendants' conduct towards racial minorities in the MTA PD amounted to a pattern or practice of discrimination. Although Title VII initially envisioned that the government would pursue pattern or practice claims, 42 U.S.C. § 2000e–6, courts have unequivocally granted private individuals the right to vindicate those claims. *See Cooper v. Fed. Reserve Bank of Richmond*, 467 U.S. 867, 876 n. 9, 104 S.Ct. 2794, 81 L.Ed.2d 718 (1984). However, "no such pattern-or-practice theory of liability is available to the private non-class plaintiffs in this case." *Chin v. Port Auth. of N.Y. & N.J.*, 685 F.3d 135, 146 (2d Cir.2012); *see also United States v. City of New York*, 631 F.Supp.2d 419, 427 (S.D.N.Y.2009) ("[I]ndividuals cannot maintain a private, non-class, pattern-or-practice claim.").

Here, Urquhart and his fellow plaintiffs have not brought their claims as a class action, and thus cannot assert pattern or practice claims of discrimination. Defen-

dants' Motion for Summary Judgment on these claims is hereby GRANTED.

### F. Claims Against MTA and Individual Defendants in Their Official Capacities Under 42 U.S.C. §§ 1981 and 1983

Plaintiff alleges that MTA is liable under 42 U.S.C. §§ 1981 and 1983 for engaging in discriminatory conduct by subjecting him to disparate treatment, a hostile work environment, retaliation, and a pattern and practice of discrimination. Plaintiff also asserts claims under §§ 1981 and 1983 against individual Defendants William Morange, Kevin McConville, and Terrance Culhane in their official capacities.[11] Plaintiff alleges that Defendants' actions deprived him of "rights, privileges and immunities secured by the United States Constitution and laws and [§ 1983]." (Am. Compl. ¶ 216.)

Section 1981 "outlaws discrimination with respect to the enjoyment of benefits, privileges, terms, and conditions of a contractual relationship, such as employment." *Patterson*, 375 F.3d at 224. Section 1983 provides for an action at law against a "person who, under color of any statute, ordinance, regulation, custom, or usage of any State ... subjects or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and law." 42 U.S.C. § 1983. "Section 1983 'is not itself a source of substantive rights'"; instead, it "merely provides 'a method for vindicating federal rights elsewhere conferred,' such as those conferred by § 1981." *Patterson*, 375 F.3d at 225 (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n. 3, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979)). Indeed, "the express

cause of action for damages created by § 1983 constitutes the *exclusive* federal remedy for violation of the rights guaranteed in § 1981 by state governmental units...." *Id.* (quoting *Jett v. Dall. Indep. Sch. Dist.*, 491 U.S. 701, 733, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989)). Although a § 1983 action may not be brought to vindicate rights conferred only by a statute that contains its own enforcement structure, such as Title VII, *id.*, a Title VII plaintiff may bring a concurrent § 1983 claim "if some law other than Title VII is the source of the right alleged to have been denied." *Saulpaugh v. Monroe Cmty. Hosp.*, 4 F.3d 134, 143 (2d Cir.1993); *see also Patterson*, 375 F.3d at 225 (" 'A Title VII plaintiff is not precluded from bringing a concurrent § 1983 cause of action' ... 'so long as the § 1983 claim is based on a distinct violation of a constitutional right.' ") (citation omitted). Here, the sources of Plaintiff's § 1983 claim are 42 U.S.C. § 1981 and the U.S. Constitution. (Am. Compl. ¶ 216); *see also Reed v. Conn. Dep't of Transp.*, 161 F.Supp.2d 73, 85 (D.Conn.2001) (noting that the source of plaintiff's § 1983 claim was § 1981).

"[W]hen the defendant sued for discrimination under § 1981 or § 1983 is a municipality—or an individual sued in his official capacity—the plaintiff is required to show that the challenged acts were performed pursuant to a municipal policy or custom." *Patterson*, 375 F.3d at 226 (citations omitted). The policy or custom need not be an express rule or regulation; it is sufficient for a plaintiff to show that the discriminatory conduct is so "persistent and widespread ... so permanent and well settled as to constitute a custom or usage with the force of law." *Sorlucco*

---

11. Although the Amended Complaint also asserted claims against Elliot Sander (Am. Compl. ¶ 16), Plaintiff abandoned this claim when he failed to mention Sander in opposition to Defendants' discussion of Sander. *See supra* Part II.B.1 n. 4 (citing cases).

*v. N.Y.C. Police Dep't,* 971 F.2d 864, 870–71 (2d Cir.1992). Additionally, "a plaintiff pursuing a claimed violation of § 1981 or denial of equal protection under § 1983 must show that the discrimination was intentional." *Tolbert v. Queens Coll.,* 242 F.3d 58, 69 (2d Cir.2001).

In support of his claim that MTA had a custom or policy of discrimination, Urquhart claims that McConville and Morange took no affirmative steps in response to the complaints of discrimination they received, and ignored or acquiesced in retaliatory actions. (Pl.'s Opp'n 22–23.) He also alleges that Culhane "engaged or acquiesced in widespread discriminatory conduct throughout his career." (Pl.'s Opp'n 24.) In addition, Plaintiff claims that not all MTA supervisors were well trained in MTA's EEO Policy, (Pl.'s Opp'n 23.), and points out that according to MTA's data, black employees were underutilized as police captains, technicians, lieutenants, detective-sergeants, and sergeants in 2008 (Jeremias Decl. Ex. LL, at D00023092–96, D00023121–23). Defendants, in response, note that MTA's data shows that, in 2004 and 2005, when Plaintiff was employed as a detective, black employees were not underutilized as detectives. (Fuchs Reply Decl. Ex. 9, at D00010423, D00010444.) Plaintiff's final pieces of evidence are the reports of his expert, which argue that there are disparities in overtime between black and white detectives, and that there are statistically significant disparities between minority and white MTA PD employees in rank, likelihood of promotion, and time to promotion. (Jeremias Decl. Exs. QQQ–RRR.)

This evidence does not permit a finding that MTA had a policy or custom of discrimination. Plaintiff's allegations about McConville, Morange, and Culhane are generalized and insufficient to show discriminatory policies or customs. Plaintiff has presented no evidence showing that any "underutilization" of minority employees was discriminatory, let alone pursuant to a general policy or custom of discrimination. No reasonable juror, looking at Plaintiff's allegations regarding supervisor training and his expert's reports, could find that a discriminatory practice so "'persistent or widespread' as to constitute 'a custom or usage with the force of law'" existed. *Patterson,* 375 F.3d at 226 (citation omitted).

Plaintiff's general allegations that MTA "has subjected, at a minimum, all ten Plaintiffs to disparate treatment, a hostile work environment, retaliation and a pattern and practice of 'persistent and widespread discrimination'" are insufficient, as a matter of law, to defeat summary judgment. (Pl.'s Opp'n 23–24.) Plaintiff has not, as required, "come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *FDIC v. Great Am. Ins. Co.,* 607 F.3d at 292. Because Urquhart cannot demonstrate that MTA had a custom or policy of discrimination, he is unable to state a claim against MTA or the individual Defendants in their official capacities under §§ 1981 or 1983. Accordingly, Defendants' Motion for Summary Judgment on these claims is GRANTED.

G. Claims Against Individual Defendants in Their Individual Capacities Under 42 U.S.C. §§ 1981 and 1983

Plaintiff Urquhart also asserts claims under §§ 1981 and 1983 against Defendants Culhane and McConville in their individual capacities. To make out a claim for individual liability under § 1981, "a plaintiff must demonstrate some affirmative link to causally connect the actor with the discriminatory action.... [P]ersonal liability under section 1981 must be predicated on the actor's personal involve-

ment." *Patterson*, 375 F.3d at 229 (citation omitted). Similarly, a plaintiff must establish an individual defendant's personal involvement in the claimed violation to find him liable in his individual capacity under § 1983. *Id.* "A supervisory official personally participates in challenged conduct not only by direct participation, but by (1) failing to take corrective action; (2) creation of a policy or custom fostering the conduct; (3) grossly negligent supervision, or deliberate indifference to the rights of others." *Rolon v. Ward*, 345 Fed.Appx. 608, 611 (2d Cir.2009) (citing *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 753 (2d Cir.2003)).

■ As to Culhane, Assistant Deputy Chief of the Eastern Region, Plaintiff alleges that he had a history of racial bias, denied Urquhart case assignments and overtime on the basis of race in the mid–1990s, and had command responsibilities for the Republican National Convention ("RNC") at the time that Urquhart was allegedly denied Executive Protection training necessary for assignment to the RNC. However, Plaintiff does not allege specific facts to indicate that Culhane was personally involved in any violations of Plaintiff's rights under §§ 1981 or 1983. Plaintiff has not pointed to any evidence that he was aware that Culhane exhibited racial bias or made racially derogatory remarks within the four-year statute of limitations. (Urquhart Dep. 82:12–13, 85:6–86:17; Urq. Decl. ¶¶ 5–6 (showing that Plaintiff was aware that Culhane made racially derogatory comments about minorities in the mid–1990s).) Nor did Culhane's alleged denial of case assignments and overtime occur within the statute of limitations. (Pl.'s 56.1 Stmt. ¶ H.)

Moreover, Plaintiff testified that he believes Flanagan made the decision to deny him Executive Protection training in 2004 and was responsible for assigning people to that training. (Urquhart Dep. 176:20–21, 177:5–9.) The only evidence in support of Culhane's involvement in the alleged training denial is Defendants' admission that he had "[c]ommand responsibilities for Republican National Convention" when he was Assistant Deputy Chief in 2004. (Jeremias Decl. Ex. A, at 6.) However, being responsible for the RNC does not equate to being involved in making or approving the assignments to a training course required to staff the RNC.

With regard to McConville, the MTA's Chief of Police with policy-making authority, Plaintiff alleges that he was responsible for the assignments of former JITF detectives to ICTF in 2003, failed to affirmatively respond to training and promotion disparities or to co-plaintiffs' complaints of racial bias, and was ultimately responsible for all personnel decisions. Plaintiff provides no support for his claim that McConville was involved in the assignments to ICTF in 2003, before McConville was Chief of MTA PD.[12] Moreover, the three cited complaints of co-plaintiffs do not indicate McConville's personal involvement. Plaintiff provides no evidence that McConville was aware of co-plaintiffs' meeting with MTA's former CEO, Katherine Lapp, which took place in 2002, years before McConville became Chief. (Pl.'s 56.1 Stmt. ¶ PPP.) McConville did respond to co-plaintiff Mazyck's 2006 complaint, by calling Mazyck to inform him that he had looked into the matter at issue. (Jeremias Decl. Ex. D ¶ 50.) Co-plaintiff Mazyck further testified that he met with Chief McConville in February 2004 to discuss

---

**12.** Plaintiff cites to Pucillo's testimony that the 2003 assignments of former JITF members to ICTF were made "with the authority [sic] of the chief of police" (Pucillo Dep. 58:22–25; *see id.* 57:17–21) and McConville's testimony that during his tenure as Chief, he approved assignments to ICTF (McConville Dep. 26:23–27:9). However, McConville was not Chief in 2003. (Pl.'s Resp. to Defs.' 56.1 Stmt. ¶ 4R.)

disparities in training, promotions, and unit assignments, but that, "[t]o [his] knowledge, no action was taken as a result of this meeting." (Jeremias Decl. Ex. D ¶ 46.) This testimony, even in combination with other generalized allegations about McConville, is insufficient to show McConville's personal involvement in any discriminatory action against Urquhart. Plaintiff has failed to demonstrate that Culhane or McConville were even aware that "constitutional violations [were] occurring." *Patterson*, 375 F.3d at 229. Accordingly, Defendants' Motion for Summary Judgment is GRANTED with regard to Urquhart's §§ 1981 and 1983 claims against Culhane and McConville in their individual capacities.

## H. Claims Against Individual Defendants in Their Individual Capacities Under the NYSHRL and NYCHRL

 Plaintiff asserts that Culhane and McConville should be held individually liable under the NYSHRL and NYCHRL as aiders and abettors. Under the NYSHRL and NYCHRL, it is unlawful "for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this [provision], or to attempt to do so." N.Y. Exec. Law § 296(6); Admin. Code N.Y.C. § 8–107(6). Actual participation in conduct giving rise to a discrimination claim may support liability under both statutes. *See Malena v. Victoria's Secret Direct, LLC*, 886 F.Supp.2d 349, 367 (S.D.N.Y.2012). Liability "may extend to supervisors who failed to investigate or take appropriate remedial measures despite being informed about the existence of alleged discriminatory conduct." *Morgan v. N.Y. State Att'y Gen.'s Office*, No. 11 Civ. 9389, 2013 WL 491525, at *13 (S.D.N.Y. Feb. 8, 2013). However, "aiding and abetting 'is only a viable theory where an underlying violation has taken place.'" *Petrisch v. HSBC Bank USA, Inc.*, No. 07 Civ. 3303, 2013 WL 1316712, at *21 (E.D.N.Y. Mar. 28, 2013) (citation omitted). Finally, under both statutes, "'an individual may not be held liable merely for aiding and abetting his own discriminatory conduct but only for assisting another party in violating' that law." *Malena*, 886 F.Supp.2d at 367–68 (citation and alterations omitted).

Plaintiff has not raised an issue of material fact as to whether Culhane or McConville failed to take appropriate remedial measures or otherwise assisted another party in discriminating against Plaintiff within the three-year statute of limitations. Although he claims that Culhane subjected Urquhart to a hostile work environment and denied him training (Pl.'s Opp'n 25), no evidence suggests that Urquhart was aware of any racially hostile statement made by Culhane after the mid 1990s or that Culhane knew about any training denials occurring within the statute of limitations. (Urquhart Dep. 82:12–13, 85:6–86:17, 176:20–21, 177:5–9; Urq. Decl. ¶¶ 5–6.) Plaintiff's allegations that McConville was aware of and participated in discriminatory transfers of former JITF members to ICTF and the alleged denial of Plaintiff's request to be assigned to JTTF (Pl.'s Opp'n 25) are time-barred, as both alleged events occurred in 2003. (Pl.'s 56.1 Stmt. ¶¶ WW, BBB; Fuchs Decl. Ex. 6). Accordingly, Defendants' Motion for Summary Judgment as to Plaintiff's NYSHRL and NYCHRL aiding-and-abetting claims is GRANTED.

## III. CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment against the causes of action of Gordon Urquhart is GRANTED in its entirety.

SO ORDERED.